CAROLINE COZZENS ET AL., Plaintiffs in Error, *v.* WILLIAM
C. JAMISON, EXECUTOR, Defendant in Error.

June 27, 1882.

1. No interest passes under a will until the testator's death.
2. An alienation of devised property by the testator during his life renders
the will *pro tanto* void; and this, notwithstanding the statute concerning
the revocation of wills.

ERROR to the St. Louis Circuit Court, LINDLEY, J.
*Affirmed*.

SAMUEL KNOX and E. CASSELBERRY, for the plaintiffs in
error.

F. A. CLINE, for the defendant in error.

BAKEWELL, J., delivered the opinion of the court.

In the year 1862, Adele Tholozan, of St. Louis, Missouri,
made her last will, by which she makes the following de-
vises and bequests : —

To Adele Philips, all debts due from her to the testa-
trix, including promissory notes.

To her sisters Caroline Cozzens and Mary Garnier, Charles
Sanguinette, her brother, Charles Bright and Eulalie Page,
children of her deceased sister Eulalie Bright, "the balance
of two tracts of land adjoining each other in St. Louis County,
containing about one hundred and fifty-four arpens,"
particularly described in a recorded deed to which reference
is made. The land to be divided into four equal parts,
one-fourth to go to each brother and sister of the testatrix,
and the other fourth to the children of the deceased sister.

To Bridget Heady, for life, the west half of lot 11 in
block 10 of East Union Addition.

To Bogy and Jamison, as joint tenants, all the "balance
and remainder" of the property and estate of the testatrix,
in trust for the sole benefit of Adele Philips, during life, and,

at her death, for the sole use of Eulalie Philips, only daughter of Adele Philips, and all other children of Adele Philips, if any be hereafter born, share and share alike ; and if Eulalie and the other children of Adele die without issue, then the property and such portions of it as shall then be on hand, shall go to, and vest in fee simple in, the brothers and sisters of the testatrix and their legal representatives, according to the statute of descents and distributions.

The testatrix died in 1877, aged eighty-two years. By her will, Jamison was appointed executor : he qualified. On final settlement, it appeared that, after the payment of all claims, there remained in the hands of the executor for distribution, of personal property, $10,406.53.

By deed dated August 23, 1871, the testatrix conveyed to one Beck 42.15 acres of the one hundred and fifty-four arpens bequeathed to her sisters, her brother, and the children of her deceased brother ; the consideration being $12,000.

The present proceeding was begun in the probate court by the brothers and sisters of the testatrix and their children, to obtain an order upon the executor to distribute amongst the petitioners the sum of $12,000, being the proceeds of the sale of real estate to Beck.

The probate court refused to make this order of distribution ; and, on appeal and trial anew in the circuit court, the application for an order of distribution was there also denied.

On the trial in the circuit court, the above facts appeared, and plaintiffs also introduced oral testimony.

Sanguinette, one of the plaintiffs, testified that the testator was his aunt. He knew her for forty years, collected her rents, and attended to her real estate. She had real estate in St. Louis and St. Louis County, worth about $60,000. At her death, she had about eighty acres left of the one hundred and fifty-four-arpen tract. Her annual income from rents was $3,000. Not long before she died, she

purchased a piece of property on Olive Street, for which she gave a piece of property on Lucas and Fourteenth Streets, valued at $6,000, and the remainder of the purchase-money, $5,500, she paid in cash, which she drew from the Boatmen's Savings Institution. She lived in this house till her death. She deposited at the Boatmen's the money received from Beck for the forty-two acres. Six months or a year before her death, she handed to witness certificates of deposit on the Boatmen's for $15,000 to $26,000; part of this money, she said, came from the sale to Beck; the remainder she had on hand. These certificates the witness caused to be renewed for her. Her deposit at the Boatmen's was a time deposit drawing interest. She always told witness that the farm in the country would go to her brothers and sisters, who were in her will, at her death.

The witness was asked what he knew of the purpose of Mme. Tholozan in relation to the one hundred and fifty-four arpens, and what he heard her state about it, and the court excluded the questions.

John Hogan testified that deceased was the aunt of his wife; he knew her intimately for twenty-five years. Witness was asked from whom the one hundred and fifty-four arpens referred to in the will was derived, and the question was excluded. The general talk between her and the members of the family was, that she had provided in her will for her brothers and sisters, that she had devised to them the tract in Prairie des Noyers, where she used to live. She had given twenty-five arpens of the front end of the tract to Mrs. Philips. The tract was originally two hundred arpens. She repeatedly said, this was all she would give to Mrs. Philips; that the farm was to be for her brothers and sisters. She had two brothers. One of them died long ago; the other, she seemed from her talk not to like much; she only left to one of his children, Adele Philips, who was the child of another brother, Seymour. She re-

peatedly told the wife of witness that she would provide for her in her will; but she did not do so. Mme. Tholozan always admitted that the $12,000 she had from the land at the Boatmen's after the sale of the one hundred and fifty-four-arpen tract, was to pay ner interest whilst she lived, and then go to the family — to those from whom the property came ; that was the inference the witness drew. She always said she intended to use it specifically there to go with the property, but she finally did not. She used it to make good the one hundred and fifty-four arpens.

The court refused the following instructions asked by plaintiffs :—

1. "If the court find from the evidence that Adele Tholozan executed the will read in evidence, and by said will devised one hundred and fifty-four arpens of the land to her brother and sisters, and the children of her deceased sister, and that said testatrix afterwards sold a part of said one hundred and fifty-four arpens so devised, as aforesaid, for the sum of $12,000, and that said will was never revoked in the manner prescribed in section 4 of chapter 131 of the Revised Statutes of the state of Missouri, then the court will find that the said devisees are entitled to recover said sum of $12,000.

2. "The fourth section of chapter 131 of the Revised Statutes of the state of Missouri provides the only method by which a will can be revoked. If the court find from the evidence that the will read in evidence was never revoked, in conformity with the provisions of said statute, that the testatrix sold, for $12,000, a portion of the one hundred and fifty-four arpens which were devised to her sisters and brother and their descendants, and retained in bank the money so received, or a greater portion thereof, with the avowed purpose that, at her decease, the same should go to said devisees, then the court will find said devisees entitled to the money aforesaid. "

At the instance of defendant, the court gave the following instruction : —

2. "The court, sitting as a jury, declares the law to be, that if Adele Tholozan, by her last will and testament, dated December 9, 1862, devised to the plaintiffs certain real estate described in the petition ; that she died in the month of April, 1877, without having altered said will, or made any subsequent will revoking the same ; that, previous to her death, she sold a portion of the real estate so devised ;. that after making said devise and various other specific legacies and devises, the testatrix gave, granted, and bequeathed and devised all the balance and remainder of her property and estate, of every nature and kind whatever, unto Louis V. Bogy and William C. Jamison, as trustees for the sole, separate, and exclusive use, benefit, and behoof of Adele Philips, her niece, during her natural life, with remainder in fee to her child or children living at her death, with remainder over in case of no such child or children alive on the death of Adele Philips, then the proceeds of the sale of said real estate, so devised, are the property of, and rightfully belong to, the residuary legatee and devisees named in the will, and should be distributed to them according to the provisions thereof, to the extent of the assets in the hands of the executor ; and the plaintiffs, as devisees of said real estate, in specie, have no rights or property in said proceeds, or any portion of them."

Ademption is the technical term used to describe the act by which a testator pays in his lifetime to his legatee a general legacy which, by his will, he had proposed to give him at death ; or else, the act by which a specific legacy has become inoperative on account of the testator having parted with the subject.

There can be no doubt, at common law, that, if a specific legacy of stocks, security, or money be named in the will, and, before the death of the testator, he dispose of

the personalty in question, the will becomes *pro tanto* inoperative, because there is an extinction of the subject, nothing remains to which those words of the will can apply, and it is held that, if the proceeds of such sale or disposition of the personalty were to be substituted and permitted to pass, the effect would be, as is said by Sir William Grant, in *Fryer* v. *Morris* (3 Ves. Jr. 363), to convert a specific, into a pecuniary, legacy.

And the same general rule applies where there has been a sale of real estate by a testator after making his will. It operates, as an ademption in case of a legacy, to render the will inoperative so far as the specific devise is concerned. *Webster* v. *Webster*, 105 Mass. 538.

Our statute provides (Rev. Stats., sect. 3963), that, "no will in writing, except in the cases hereinafter mentioned, nor any part thereof, shall be revoked, except by a subsequent will in writing, or by burning, cancelling, tearing, or obliterating the same by the testator, or in his presence by his consent and direction." This provision as to modes of revocation is the same as the provision in the statute of 29 Charles II. (ch. 3, sect. 5). Similar provisions probably exist in most of the states. In Massachusetts it is expressly provided that nothing in this section of the act concerning wills "shall prevent the revocation implied by law from subsequent changes in the condition or circumstances of the testator." Stats. 1882, p. 748, sect. 8. This provision seems to have been added by extreme caution. The doctrine runs through all the cases, that the devisor must be seised of the same estate at the time of his death that he was seised of when he made his will, to make it a good devise. *Ballard* v. *Carter*, 5 Pick. 116. If there is a subsequent conveyance of the whole estate, the testamentary disposition is defeated wholly. If the conveyance be of a part only, the operation is *pro tanto*. Toll. Ex. 19.

In New York, the statute provides, and did at the time of the will in question provide (2 Rev. Stats. N. Y. 64, sect.

42), that "no will in writing, except in the cases herein-after mentioned, shall be revoked or altered, otherwise than by some other will in writing, executed, etc., or unless such will be burned, * * * with the intent to re-voke the same." Yet it was held there, in regard to the Astor will, that a gift to a legatee might be deemed a satis-faction of a particular legacy, and that the statute does not cover ademptions by which the testator pays to his legatee in his lifetime a general legacy which, by his will, he had pro-posed to give him at his death. *Snyder* v. *Astor's Executor*, 16 N. Y. 41. Yet such a gift, if it renders the bequest inoperative, is certainly a revocation of the will *pro tanto*, in a certain sense. And Lord Eldon, in a case cited in the opinion just referred to (18 Ves. 155), speaks of subse-quent advances operating as a revocation, and therefore rendering actual revocation unnecessary ; but he may not mean that the subsequent satisfaction was in an exact sense a revocation, but that it operates in the case of ademption and satisfaction as a revocation, by rendering the will nugatory in part.

We are of opinion that the legislature, in speaking of revocation in the section of the statute of wills, must have intended to use the word in the sense in which it was used in the English statute, and that they did not mean to in-clude the case of ademption either by payment during the lifetime of the testator to the legatee, or by parting during the lifetime of the testator with the thing bequeathed, or the land devised. The English statute is express (29 Ch. II., ch. 3, sect. 6) : "And, moreover, no devise in writing, of lands, tenements, or hereditaments, nor any clause thereof, shall, at any time after the said four and twentieth day of June, be revocable, otherwise than by some will or codicil in writing, or other writing declaring the same ; or by burning, cancelling, tearing, or obliterating the same by the testator himself, or in his presence by his direction or consent ; but all devises and bequests of lands and tenements shall re-

main and continue in force until the same be burnt, cancelled, torn, or obliterated by the testator or his directions in manner aforesaid, or unless the same be altered by some other will or codicil in writing, or other writing of the devisor, signed in the presence of three or four witnesses, declaring the same; any former law or usage to the contrary notwithstanding.'' And yet, it has always been held in England, that if the devisor was not at the time 'of his death seised of the same estate as at the time of his will, the devise was not good; and that any alteration in the estate after the making of the will, has the effect of a revocation, whether it be properly called a revocation within the meaning of the language of the statute of wills or not. *Goodtitle* v. *Otway*, 1 Bos. & Pul. 576; *Swift* v. *Roberts*, 3 Burr. 1491. The common-law rule, both before and since the statute of wills (29 Ch. II., ch. 3), has always been, that, where a testator conveys his whole interest by bargain and sale or otherwise, the devise was ineffectual, and this, very often, when this was plainly contrary to the intention of the testator, and when the rule bore hard. No interest passes until the death of the testator, and when he dies, the will conveys to the devisee such interest as the testator has devised to him, provided the testator is still seised of the property at the time of his death. The devise is said to operate only upon the seisin which the devisor had at the time of making his will; and in spite of the language of the statute of wills, an alienation during the lifetime of the testator was, after as well as before that statute, looked upon as a disagreement to the devise, and as rendering the will *pro tanto* void. We take it that the legislature, in adopting the language of the English statute, adopted it with the meaning that had been given to it by a long construction, and did not mean to change the rule applicable to a devise of lands, that, where the testator sells the land devised, that provision of his will becomes at once inoperative.

We are of opinion that the judgment ought to be affirmed. With the concurrence of all the judges, it is so ordered.