(56 South. 305.)

No. 18,059.

GRAY v. SPRING et al.

(June 30, 1911. Rehearing Denied Oct. 16, 1911.)

*(Syllabus by the Court.)*

1. QUIETING TITLE (§ 16*)—RIGHT OF ACTION—PERSONS ENTITLED TO SUE.

Where one purchases real estate sold by the sheriff under execution, he acquires it with all the rights of the seised debtor and former owner, and subject to the burdens imposed by him, and no one can thereafter either deprive him of those rights or increase those burdens. Hence, where such purchaser finds the property so acquired incumbered with an oil and mineral lease, into which the former owner had entered, he has the same right of action to annul it as operating to cloud his title that such former owner had.

[Ed. Note.—For other cases, see Quieting Title, Dec. Dig. § 16.*]

2. MINES AND MINERALS (§ 58*)—OIL AND MINERAL LEASE—RIGHT TO ATTACK VALIDITY.

Where a purchaser at sheriff's sale finds the property acquired by him incumbered with an oil and mineral lease entered into by the former owner, and finds that the lessee is, and for more than a year prior thereto has been, merely making a pretense of prosecuting, with diligence, the search for oil and minerals in paying quantities, and where thereafter even such pretense is discontinued, the owner of the land may invoke the original nullity of the lease for want of consideration and failure to impose an obligation on the grantee, even though he or the former owner might have been estopped to invoke such nullity as against particular parties and at particular times by reason of acquiescence in the incurring of expense and the undertaking, or actual prosecution, of work for the accomplishment of the purposes of the contract.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 58.*]

3. MINES AND MINERALS (§ 66*)—OIL AND MINERAL LEASE—ABANDONMENT BY LESSEE.

The question of the abandonment of a contract such as an oil and mineral lease by the lessee is ordinarily a matter of fact and intention, but it may be altogether a matter of fact and law; and where, as a matter of fact, work under such contract is discontinued under circumstances which fail to furnish a sufficient reason for the discontinuance, or for the belief that there was any definite intention of resuming such work, the fact of the abandonment is controlling.

[Ed. Note.—For other cases, see Mines and Minerals, Dec. Dig. § 66.*]

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Winston Overton, Judge.

Action by John G. Gray against John V. Spring and others. From a judgment for plaintiff, defendants appeal. Affirmed.

Gorham, Gorham, Williams & Williams, Farrar, Jonas, Goldsborough & Goldberg, and Gayle & Porter, for appellants. Leon Sugar, D. E. Greer, Denegre & Blair, and Victor Leovy, for appellee.

Statement of the Case.

MONROE, J. This is a suit to annul and cancel from the records certain oil and mineral contracts, or, in the alternative, and in the event that the contracts are sustained, to recover rents which, it is alleged, would, in that event, be due thereunder.

The facts upon which the suit is based are as follows: Prior to May 14, 1901, John G. Gray, plaintiff herein, and Aladin Vincent, owned 4,688.05 acres of land in Calcasieu parish. On that day Gray sold his interest to Vincent and two associates (the Messrs. Perry) for $234,402.50, of which $25,000 was paid in cash, and the balance was represented by notes, payable in one, two, and three years, with interest at 8 per cent., and secured by mortgage and vendor's lien. The first note was not paid at maturity, and in the meanwhile Vincent and his associates appear to have organized the Vinton Oil &. Sulphur Company, Limited., of which Vincent was made president, and to have conveyed to that company the whole of the land mentioned. On April 25, 1903, Gray & Vinton Company (as we shall call it), represented by Vincent, entered into a written contract which recites that by payments on one of the notes held by Gray the balance due on all of them had been reduced to $200,-000, and whereby Gray agreed that the interest thereon should be reduced to 5 per cent. and the terms of payment extended; **and**

Vinton Company in order further to secure such payment specially mortgaged in favor of the then and future holder of the notes the half interest in the land in question which had not been owned by Gray. On August 8, 1904, Gray obtained judgment on the notes, upon which no further payments appear to have been made, with recognition of his mortgage on the entire property, and, by virtue of a writ of execution issued thereunder, the sheriff seized the entire property, together with other tracts belonging to Vincent, and on January 7, 1905, adjudicated all that he had seized to the plaintiff in the writ. Thereafter, on June 9, 1905, Gray and Vincent entered into a notarial contract reading in part, as follows:

"That for the purpose of preventing litigation, and in order to adjust their difficulties, John G. Gray and Aladin Vincent have agreed as follows, to wit: That said Aladin Vincent does hereby ratify and approve the adjudication made by the sheriff * * * to John G. Gray, on January 7, 1905. * * * The said Aladin Vincent does hereby transfer and deliver to the said John G. Gray all fencing on the property embraced in the adjudication aforesaid, as well as all fencing now under seizure, under alias writs of fi. fa., issued in the aforementioned suit. * * * The said Aladin Vincent does hereby bargain, sell, transfer, and deliver unto the said John G. Gray, with subrogation of all of the rights and actions of warranty to which he is, or may be, entitled, against all former owners or vendors, the following described property, to wit: The N. ½ section and the S. ½ of S. E. ¼ of Sec. 34; T. 10 S. R. 12 W.; the W. ½ of S. E. ¼ and S. W. ¼ of section, and W. ½ of N. W. ¼ of Sec. 23; T. 11 S., R. 13 W.; all that part of S. W. ¼ of N. W. ¼ of S. W. ¼ of Section 15 T. 10 S. R. 12 W., Calcasieu parish, containing 5 acres, more or less. To have and to hold the above-described property, together with all and singular the rights and appurtenances thereto in any wise belonging, unto the said John G. Gray and to his heirs and assigns forever; binding himself and his heirs, executors and administrators, to warrant and forever defend all and singular the said property unto the said John G. Gray, his heirs and assigns, against any person whomsoever lawfully claiming or to claim the same or any part thereof. * * * The said Aladin Vincent binds and obligates himself to vacate the premises now occupied by him, and which are included in the aforesaid adjudication * * * on or before thirty days after date. The said John G. Gray hereby binds and obligates himself to purchase,

from Mrs. Aladin Vincent, at the price and sum of $5.00 per acre, the following described lands owned by the said Mrs. Aladin Vincent, to wit: The S. E. ¼ of the S. E. ¼ of Sec. 18 and the E. ½ of the N. E. ¼ of Sec. 19 and the N. W. ¼ of the S. W. ¼ of Sec. 20, T. 11 S. R. 12 W. Louisiana meridian, containing 160 acres more or less. The said John G. Gray does forever release and discharge the said Aladin Vincent from any and all obligations or liability unto him, the said John G. Gray, on account of the judgment rendered in the said suit No. 5208, entitled John G. Gray v. Aladin Vincent et al., * * * and will enter said cancellation on the face of said judgment."

Of the tracts of land, upon the title to which plaintiff alleges that the contracts of which he is complaining are casting a cloud, the N. ½ and S. E. ¼ of S. E. ¼ of section 34, township 10 S., range 12 W., were acquired by him by the purchase from Vincent of June 9, 1905, and the other tracts were acquired at the sale by the sheriff of January 7, 1905, none of the property here in dispute having been included in the sale by plaintiff to Vincent of May 14, 1901, or in the mortgage granted to plaintiff by Vinton Company on April 25, 1903.

The present relation of the defendants to the tracts in dispute came about as follows:

On February 4, 1901, Vincent, who then owned said tracts, entered into a contract with Dr. Jno. V. Spring, reading as follows:

"That A. Vincent, party of the first part, * * * in consideration of the sum of $1.00, paid by Jno. V. Spring, parties of the second part, * * * and the further consideration hereinafter mentioned, have (sic) granted, bargained, sold, and conveyed, and do, by these presents, grant, bargain, sell, and convey, unto the said parties of the second part, their heirs and assigns, all of the oil, gas, and coal and other minerals in, and under, the following described land, to wit:

|  |  | Acres. |
|---|---|---|
| South ½ section 27 | | 320 |
| "      ½ "      28 | | 320 |
| "      ½ "      29 | | 320 |
| East ½ "      34 | | 320 |
| Northwest ¼ section 34 | | 160 |
| North ½ of north ½ section 33 | | 160 |
| South ¼ N. E. ¼ and north ½ S. E. ¼ and S. E. ¼ of S. E. ¼ section 33 | | 200 |
| North ½ and north ½ of south ½ and S. E. ¼ of S. E. ¼ of section 32 | | 520 |
| | | 2,320. |

"All in township 10 south, range 12 west, La. Mer., together with all the rights of ingress and egress, at all times, for the purpose of drilling, mining, and operating for minerals, and to conduct all operations and to lay all pipe necessary for the production, mining, and transportation of the oil, gas, coal, or other minerals; reserving, however, to the party of the first part the equal one-eighth of all oil produced and saved upon said premises, to be delivered in the pipe line to the credit of the party of the first part, free of charge. If coal is found, the parties of the second part agree to pay to the party of the first part 5 cents per ton for every ton of the same that is mined and marketed, payable monthly; if gas or other minerals are found, second party agrees to pay, monthly, for the product of each well while the same is being used off the premises.

"To have and to hold the above-described premises to the said parties' of the second part, their heirs and assigns, upon the following conditions:

"In case operations for either the drilling of a well for oil or mining for other minerals are not begun and prosecuted with due diligence within 60 days from this date, then this grant shall immediately become null and void, as to both the parties; provided, that said second party may prevent such forfeiture, from year to year, by paying to the first party the sum of $2,320 per annum, until such well is completed or until shipments from such mines have begun. In case the parties of the second part should bore and discover either oil or gas, coal, gold, lead, or other minerals within the time above prescribed them, and in that event, this lease, incumbrance, or conveyance shall be in full force and effect for twenty-five years from the time of the discovery of said product, and so long thereafter as oil or gas, coal, lead, or other minerals can be produced in paying quantities.

"Whenever sales are being made of the product on the land above described, a settlement shall be made at the end of each quarter; providing that first party shall have the right to pay for piping from surface to artesian water and take the water in case no oil or mineral is found; and providing that second party shall not interfere with cultivation, irrigation, and grazing of said lands further than may be necessary for the proper working of said wells or mines.

"This lease is not intended as a mere franchise, but is intended as a conveyance of the property above described for the purposes herein mentioned, and it is so understood by both parties to this contract.

"It is understood between the parties to this agreement that all conditions between the parties hereto shall extend to their heirs, executors, administrators, and assigns. The said party of the second part is further to have the privilege of using sufficient gas and water from the premises herein leased to run the neces-sary engines, the right to remove any machinery, fixtures, and buildings placed on said premises by said party of the second part, or those acting under him, and is not to put down any well for oil on the lands hereby leased within ten rods of the buildings now on said premises without the consent of the party of the first part.

"And it is further agreed that the second party, his heirs or assigns, shall have the right, at any time, to surrender up his lease and be released from all moneys due and conditions unfulfilled then; and from that time this lease and agreement shall be null and void and no longer binding on either party, and the payments which shall have been made be held by the party of the first part as full stipulated damages for the nonfulfillment of the foregoing contract, and all the conditions between the parties hereunto shall extend to their heirs, executors, and assigns.

"In witness, we, the said parties of the first part and second part have hereunto set our hands, this 4th day of February, A. D. 1901.
          "[Signed]   Aladin Vincent.
                 "John V. Spring.
"Witness:
   "Caesar Hebert.
   "John L. Vincent."

For the execution of the contract thus recited Dr. Spring made a contract with T. C. Stribling, which recites that the "lease" from Vincent requires that operations shall be "begun and prosecuted with due diligence" within 60 days from February 4, 1901, and that Stribling is to begin and prosecute the work within that time in order to prevent the forfeiture of said "lease." Spring testifies that the contract was really made at Vinton on March 27th, but was not signed until March 29th. The instrument referred to purports to have been drawn up in San Antonio, Tex., on March 29th, where it was signed on that day by Spring, but it was not signed by Stribling at all; and Stribling, as a witness for, and favorably disposed to, defendants (he being one of them), testifies that he made the acquaintance of Vincent and Spring in April, and began his operations on the lands in question about the 1st of May. Banker, another defendant, who worked for Stribling, testified that the latter began work in April, and it otherwise appears that in April Vincent complained that

Spring's contract had not been complied with —a complaint which, as we shall see, he followed in 1904 by a suit to annul the contract, on the ground that the work had not been prosecuted with diligence. Vincent also testifies in this case that Stribling began work in April, 1901, but he does not profess to be very positive as to the exact date. However that may be, the only penalty imposed upon Stribling by his contract for failure to comply therewith was the forfeiture of the one-fourth interest in the Vincent-Spring "oil and mineral lease" (as the parties, generally, call it), and on July 29, 1901, Stribling sold his interest and appliances to E. D. Prather and withdrew from the business; the reason that he gives for so doing being that he had some other oil interests, and was not able financially to go on. Prather, after buying out Stribling, made a contract of some kind with Spring and S. F. Wiles, but it does not definitely appear what they did in the way of executing the main contract, though it does appear that Vincent still complained that the main contract had not been executed, and that there was some talk of a suit to declare it at an end, and it further appears that Prather in September of 1908 wrote to the curator ad hoc who had been appointed to represent him in this case, saying:

"Yours of 5th inst. received. I do not care to have any one represent me in this case as I think Mr. Gray has every right to ask for a cancellation of the lease, and I thought it had been, long since, canceled by lapse."

On August 5, 1902, Prather, Spring, and Wiles entered into a contract with the "Vinton Oil Syndicate" (not to be confused with the Vinton Oil & Sulphur Company), of which W. B. Sharp was president, whereby Prather waived his interest in the main contract, and Spring and Wiles, appearing as the parties of the first part, assigned to the syndicate a one-half part of "that certain oil and mineral lease from A. Vincent" for a consideration stated as follows:

"Now the consideration for the assignment herein made to the said party of the second part is that it will continue the prosecution of said work, under the terms of said original lease, with due diligence, so as not to cause a forfeiture of the same, and unless oil is soon found in paying quantities, will sink a well on said property to a depth of 1,500 feet, which is to be done within four months from this date if possible, unavoidable delays and accident excepted."

There are, then, some further stipulations that are unimportant to the present inquiry, and the contract proceeds:

"In case the party of the second part should determine to abandon the further development of the property, it binds itself to give the parties of the first part thirty days notice of such intention, but it is not to be held to operate its machinery during such thirty days. The said Ed. Prather subscribed his name hereto as an evidence of his assent to the making of this contract. August 5, 1902. [Signed]" etc.

The syndicate employed a driller named Stern, who drilled some wells, but about July, 1903, Spring, being of opinion that their contract had not been complied with, notified their attorneys that, if they (the syndicate) came on the land any more, they would be prosecuted as trespassers, and they came no more. Dr. Spring then employed B. J. Banker, a man who had worked for Stribling and his successors, as he (the doctor) says, in his testimony, to develop "that shallow oil," meaning an oil with which the ground near the surface seemed saturated, and which was to be collected in small quantities by boring holes to a depth of from 25 to 35 feet and lining them with perforated wooden casings through which the oil would seep into the holes, to the extent of perhaps a barrel in a day, and from which it would be pumped by a "common little pump" worked by hand. Banker bored 25 such holes, of which 20 were spoiled by water, and from the remaining five he obtained 144 barrels of oil in 17 months. He says at one time that he sold the oil for $7.50 per barrel, and in his final statement of the results of his operations he says that the total amount realized by him was $1,080, and that his profit was $281, but no charge

for his own time and services appears to figure in his calculation, and he says, "I pumped wells for 17 months." In the fall of 1904 (probably about October 1st) all machinery and appliances for the development of the mineral resources of the land were hauled away, and we think that Banker abandoned the job about the same time, but counsel have accepted December 1, 1905, as the time of his departure, and we shall adopt that date for the purposes of this decision. In any event, Banker was left, as we take it, with only such simple apparatus or tools ("rig," as he calls it) as were required for the boring of the shallow holes, and he says that he discovered that an "augur" was better than a "rotary" for that purpose.

Whether the augur was operated by hand, mule, or steam power does not appear. In the meanwhile—on July 5, 1904—Vincent had instituted a suit to annul his contract with Spring, alleging, among other things:

"That on the 4th day of February, 1901, petitioner leased * * * to one John V. Spring * * * the following described property. * * * That under the * * * lease it was specially stipulated that, in case operations for either the drilling of a well for oil or mining for other minerals was not begun with due diligence within 60 days, * * * said lease should immediately become null and void, * * * provided that said * * * Spring, lessee, might prevent such forfeiture * * * by paying * * * the sum of $2,320 per annum until such well was completed. That among other obligations assumed by the said lessee he agreed to deliver to petitioner one-eighth of all the oil produced and saved upon the property leased * * * and to settle with petitioner at the end of each quarter for any and all sales that might be made of the product produced thereon. * * * That the said * * * Spring has utterly failed to carry out or comply with the obligations assumed by him in said lease, and particularly those hereinbefore detailed. * * * That said lessee has not completed an oil well on said property. That he has not paid the rental of $2,320 as stipulated, although same was amicably demanded. That no drilling whatever has been done on said property by either the said Spring or his representatives since the month of May, 1903, and that on or about the 15th day of June, 1904, all drilling machinery was removed therefrom, whereby petitioner's property was entirely abandoned by said lessee. Petitioner further alleges that there was no consideration for the execution of said

129 LA.—12

lease, or alleged conveyance, * * * and that he has received no consideration therefor since its execution. * * *"

He prays for judgment annulling said "lease" and ordering the cancellation of the inscription thereof.

Defendant filed an answer, alleging that he had complied with the contract; that it was not a lease but a conditional sale; that he had discovered oil in paying quantities; and that plaintiff was estopped by acquiescence. The suit remained pending until January 30, 1906, and Vincent had in the meanwhile moved away from Louisiana, and was living in San Antonio, Tex. Some time prior to the date last above mentioned, he was approached by Mr. J. N. Grosbeck, who proposed to him, as we construe the evidence, that, if he would allow judgment to go against him and allow Spring to be decreed the owner of the mineral rights referred to in the contract which he was suing to annul, Spring would convey to him a one-third interest in those rights. Vincent himself says in his testimony:

"The deal was made through Mr. Grosbeck. Dr. Spring and I were barely on speaking terms after the filing of that suit. We couldn't meet and talk—barely spoke when we met—and Mr. Grosbeck spoke to me a number of times about it in San Antonio, and told me that, if I would permit that suit to come to trial, he would see to it that Dr. Spring would make me a transfer of interest in that mineral holdings there."

The case came to trial accordingly. Plaintiff introduced in evidence the contract to annul which the suit was brought. Defendant took the stand, and testified that it had been executed; and there was judgment decreeing that it was in full force, and that defendant was the owner of the oil and mineral rights lying beneath the land therein described. Mr. Vincent was interrogated, and answered concerning the trial of the case, if it can be called a trial, as follows:

"Q. Did you furnish your attorneys with the names of any witnesses to prove the allegations of your petition? A. I have no recollec-

tion that I ever named any witnesses in that suit at all. Q. You did not take the stand as a witness, yourself, did you? A. I did not."

He also testifies that he was present in court at the trial. On March 26, 1906, a little less than two months after the judgment had been rendered, Spring executed an instrument whereby he conveyed to Vincent for "$600, cash in hand paid * * * and for other valuable consideration * * * a one third, undivided, interest in and to all the oil, coal, sulphur and other minerals in and under the following described lands" (describing the lands which are included in the contract of February 4, 1901). There was no cash whatever paid by Vincent, who, being asked what the other valuable consideration was, replied that he did not know, and, in answer to a further question, gave the testimony already quoted, beginning with: "The deal was made through Mr. Grosbeck," etc. On the day that the judgment above referred to was rendered, Spring, for himself and as attorney for Wiles, "for $500" (which was not paid) "and other valuable consideration," conveyed to Grosbeck, without warranty of title, "a two-thirds undivided interest in and to all the oil, gas, coal, sulphur and other minerals in and under" the lands described in the Vincent-Spring contract; and Grosbeck thereafter brought suit against the Vinton Oil Syndicate, alleging that it was setting up some claim to the rights so conveyed, and praying that its pretended title thereto be decreed void. What became of the suit does not appear, and the syndicate, though plaintiff prayed that it be cited, was not cited, and has not appeared in this litigation. In July, 1907, Vincent returned from San Antonio, and for two or three weeks had a couple of men engaged, the one in drilling, the other, in pumping, shallow wells on the land in question. Being asked who was interested in the enterprise, he replied:

"Mr. J. N. Grosbeck, of San Antonio, T. E. George, and, I think, Dr. John V. Spring, was also interested, and myself. We made an agreement and they made up a purse of money—$200—which was sent * * * subject to my order."

Being asked why operations were discontinued, he replied:

"Well, I can speak for myself. I stopped work for several reasons. The principal one of them was the trouble with Mr. Gray. I was told that he was working to put me off of there, * * * and, knowing myself and my feeling toward him, I knew that there would be a serious personal difficulty. I knew we couldn't talk—that was quite impossible—and that was the principal reason why I left. Another reason was that he had flooded the country there, and the roads were impassable. I had to go a roundabout way, over the land not in cultivation, at least three miles out of my way, to get there. Mr. Caruthers was hauling the oil away from there. Another reason was, the panic of 1907 came on in the fall, and the sawmills stopped. The Industrial Lumber Company at Vinton was supplied with oil, didn't want any more, * * * and there was practically no sale for oil. I therefore suspended operations, expecting to go back. Finally this suit was brought."

The witness mentioned the names of two persons from whom he says he heard that plaintiff was "working to put him off." One of them, his brother, testified that he had a conversation with plaintiff in which he asked him what he intended to do, and that "he said he did not know. He said: 'We may enjoin, and we may get them for trespassing. I don't know until I see my attorney.' * * * He said he desired to wait." The witness further says that about two days later his brother (Aladin Vincent) asked about the matter, and he told him what Gray had said, and that he thinks that "they" (meaning his brother and associates) operated for two or three weeks.

The other person mentioned by Aladin Vincent was not called to corroborate him, and it is affirmatively shown that Gray never made any threats from which a personal difficulty between him and Vincent could reasonably have been anticipated. It is shown that he had about 2,000 acres of the land

that he had acquired, including that here in controversy, under cultivation, and, as it was probably in rice, the flooding was an incident of the cultivation, though it is not pretended that any water was turned on where Vincent was operating. The manager of the Industrial Lumber Company testifies that he stopped buying oil from Vincent because the price was too high.

Sydney Caruthers testified that he pumped for 9 or 10 days; that he was the only person who did any pumping for Vincent; that he produced 22 barrels of oil, of which he thinks 6 barrels were left on the field, and that, when he quit (in July, 1907), there was no one left behind. From that time to the present there has been no one on the land representing the Vincent-Spring contract, and plaintiff has been cultivating all of it, with the exception of about 150 acres. When on the stand as a witness, he gave the following, with other, testimony:

"Q. Have you ever forbid any of the defendants from prospecting on that land for oil or minerals? A. I did not. I will state that when Vincent came up there, and said he was going to develop, I came and consulted with my attorney immediately. It was some time before the suit was filed [more than a year]. I forbid no one to prospect there, nor have I ever been paid a cent, either in oil or money."

He says that neither Banker nor any one else ever tendered him any oil; that Vincent was present at the sheriff's sale, when he (Gray) bought the land and said nothing about any rights that he might have in the oil or minerals that lay beneath the soil, and, further, as follows:

"I considered at all times since the first purchase, January, 1905, that I was the owner of these lands; * * * and, if there was any defect in the transfer by sheriff's deed, that it was cured entirely and perfectly by the ratification of Mr. Vincent in June, 1905, and that in the event that there had been any validity in the Spring lease the royalty would inure to me as owner."

In March, 1908, Mr. T. E. George, acting in his own behalf and in behalf of Spring, and those who may have been interested with him, called on plaintiff, and carried away with him a memorandum of an agreement such or about such as plaintiff was at that time willing to make, to wit: Spring and his associates to clear from the records the Vincent-Spring contract and all claims affecting the land by Spring, Vincent, Stribling, or the others who have been mentioned, after which, and after payment to him in cash of rental from October 1, 1904, to the date of its execution, Gray to execute a lease of the lands to Spring, or some one to be designated by him. Spring, however, declined to make such an agreement, and on August 1, 1908, plaintiff instituted this suit, and on July 1, 1909, obtained judgment, as prayed for, from which Spring, Grosbeck, Vincent, and Banker have appealed.

## Opinion.

The parties originally made defendants were Spring, Stribling, Prather, Wiles, Banker, and Vincent, and they all appeared through counsel, or through curators ad hoc. Plaintiff alleges, in substance, that he is the owner of the property described in his petition, and has been in open, continuous, peaceable possession of the same since January 9, 1905; that defendants are casting a cloud upon his title by claiming rights under the Vincent-Spring contract, which is recorded in the conveyance office; that said contract is without effect for the reasons that it is a nudum pactum, and that the parties defendant had abandoned it, as, also, the land referred to in it before the sale of said land to plaintiff; that neither oil nor other minerals have been discovered on or under said land in paying quantities; that no payments to prevent forfeiture were ever made to Vincent or have ever been made to plaintiff; that by virtue of the sheriff's sale and the act of ratification by Vincent plaintiff acquired all the rights that Vincent had under said contract; that, if the contract be considered a lease, it should be decreed null be-

cause it requires settlements to be made quarterly whenever sales shall be made of the products, and that, though there were sales of oil during the year 1907, none of it was delivered or offered to plaintiff; that on July 5, 1907, Vincent sued to annul said contract, setting forth his reasons therefor, and that Spring answered; that the case was not tried for more than a year after petitioner had acquired title to the land, and that the judgment was the result of a confederation between Vincent and Spring to harass petitioner and cast a cloud upon his said title. There are other allegations, more or less repetitions of those above recited, and it is finally alleged:

"That in the event the court should find that he is not entitled to have the said contract of February 4, 1901, annulled, * * * then, and in that event, he is entitled to recover from said parties in solido lease or rental at the rate of $2,320 per year, dating from January 7, 1905."

The prayer is for judgment annulling the contract in question, and decreeing the cancellation of the inscription thereof from the records of the conveyance office, or in the alternative, and, should the court maintain the contract, awarding plaintiff rental at the rate of $2,320 per annum from January 7, 1905.

Counsel for defendants, Spring and Grosbeck, insist upon an exception (filed in the lower court) of no cause of action, but we are of opinion that it is not well founded, inasmuch as the petition alleges that the contract sought to be annulled is a nudum pactum, and was abandoned, and, if the court should hold that it was not abandoned, that the work called for by it was not prosecuted as required, and that defendants are liable for rents, for which judgment is prayed in the alternative.

[1] On the merits we find that the contract in question was without legal effect in the beginning, since Spring paid nothing and bound himself to nothing, but expressly stipulated that he should "have the right, at any time, to surrender up his lease and be relieved from all moneys due and conditions unfulfilled," from which time the "lease and agreement" were to be no longer binding upon either party.

And that he understood that he was in no manner bound is evident from his testimony. Thus, after stating that men were ready to begin work under the contract on April 3, 1901, he proceeds:

"But we could not begin the actual boring for the oil because the rotary had not arrived. So the absolute and direct boring for the oil began, as near as I can remember, eight or ten days later. At this time I had a notice served on me that I was not complying with my contract, and I disputed the fact that I had a contract. I had no contract, except with T. C. Stribling, and I asked if he was not carrying out his contract, and I proved by every positive means that the contract that was with him was being carried out—I had none myself—no contract to carry out. I owned the mineral rights under that property, and I was there to develop it and get it out."

Considering that the mineral rights thus referred to had unquestionably belonged to Vincent, and that the witness had neither paid anything nor agreed to do anything as a consideration for their conveyance to him, and that there is no pretense that they were donated, the question suggests itself, By what title did he acquire them? Not only did Dr. Spring pay nothing to start with (for we ignore the $1.00, the receipt whereof is acknowledged), but, according to the best information that the record affords us, he had expended nothing since the start, for the actual execution of work contemplated by the instrument of which he and Vincent were the signatories, to wit, for the development of the mineral resources of the land described in said instrument, and during the 10 years that have elapsed since that instrument was signed the owners of the land have received nothing by reason of its stipulations, though its inscription in the conveyance office has incumbered their property, and though Dr. Spring, upon whom it imposes no obligation whatever, has been en-

abled to speculate upon the interest in the property with which it purports to invest him and has sold to one person and another fractional portions of that interest, which, in the aggregate, exceed the whole, so that, according to the evidence in the record, he has now no interest in the contract which is the subject of this litigation, and hence no interest in the litigation.

[2] Those persons, natural or artificial, who have expended either money to speak of or effort in actually exploiting the lands here in dispute, have been eliminated and are claiming nothing. Stribling, who invested perhaps $8,000, got his money back from Prather. Prather and the Vinton Oil Syndicate, who invested considerably more, lost the greater part of their investment, and in the fall of 1904 hauled away the machinery representing the balance. Banker put in but little, and says he came out with a profit, and, though we doubt the correctness of his calculations, we do not find that he is in a a position to complain of what the owners of the land may see fit to do with it; and the same in regard to Vincent and Grosbeck; the former spent the $200 advanced by the latter, together with George, and possibly Spring, in experimenting with the shallow holes and the common little hand pumps, and, then, like Banker, abandoned the field. The latter at a time when Spring had about ceased from troubling and the weary owner of the land was almost at rest appears to have taken hold of the idea that, though the land need not be, the interest of Spring in the land might be, further exploited, and he contributed to the $200 purse that was placed at the disposal of Vincent.

There is therefore no one before the court on the side of the defendants, who is out of pocket to any appreciable extent by reason of anything that has been done, or is now being done, by way of actual execution of the contract which plaintiff seeks to annul, or which has conferred, or is likely to confer, any appreciable benefit upon the owner of the land affected by that contract. Stribling and Prather and the Vinton Oil Syndicate, however, invested money and serious effort in bona fide attempts to "develop," according to Spring's contract with Vincent; and, as Vincent, the then owner of the land to be developed, stood by, making no protest, and ready to reap his share of the profits, if there had been any, he could not have been heard, after the expenses had been incurred, and while the work was in progress or upon the eve of its completion, to set up objections to the contract upon the ground that it did not bind Spring to do anything. But the parties named have passed from the scene, and even Banker and Vincent had abandoned all pretense of effort long before this suit was instituted, leaving the Vincent-Spring contract as it stood originally, with no obligation whatever resting on Spring or any one else with regard to the development of plaintiff's land. And, if this court were now to decree that contract enforceable, as against plaintiff, it would be entirely optional with Spring (if he still has an interest), Grosbeck, Vincent, and Banker either to exploit the land effectively, to make a pretense of exploiting it, or to do nothing until called upon by plaintiff in another lawsuit to explain why they accomplish nothing, and why he, with his property tied up, gets nothing. The reasons why the complaint—that the contract in question is void, because it is thus left optional with one of the parties to perform or not, at his pleasure—could not have been heard under the circumstances stated above have therefore no application to the present situation, or to the situation as it has existed at any time since plaintiff acquired the land affected by that contract. He acquired the land with all the rights of the defendant in execution, the former owner, and subject to the burdens imposed upon it by the former

owner; but no one could thereafter deprive him of those rights or increase those burdens. He was put in possession by the sheriff in January, 1905, and at that time (assuming that Banker was still on the land, pumping the shallow wells) there was no work or contract pending which had for its purpose the development of the mineral resources of the land, in accordance with the contract here attacked, and there had been no such work or contract for eighteen months. The serious and bona fide attempts to comply with that contract had ended with the abandonment of the field by the Vinton Oil Syndicate in May or June, 1903; and the subsequent placing of Banker on the land was in our opinion mere pretext of compliance, and stop-gap, the purpose of which was to hold the position until Dr. Spring could find some other person, able, and willing to undertake a compliance in accordance with the spirit and meaning of the contract. The plaintiff as the owner of the property had no means of compelling Dr. Spring to act in the matter, or even of knowing what his intentions were, but he construed the contract with which he found his land incumbered to mean, that the diligence required of the contractor in the prosecution of the work of development was not to be limited to the first 60 days of the life of the contract, but was to continue so long as the contractor should hold that the contract subsisted and did not surrender it, and from that premise he reached the conclusion that the contractor was not using and had not been using the required diligence. He, however, took no action in the matter and the contractor was afforded an opportunity, of which he might have availed himself, had he been in a position to do so, to make a genuine effort to find oil or other minerals in paying quantities rather than to continue his speculative operations upon his supposed proprietary interest in such products. Nothing further was done, however, and at the end of the year Banker discontinued his operations and withdrew from the land, and there was, then, an interval of 18 months or more (from say, December, 1905, until July, 1907), during which the contractor made no pretense of doing anything that could have been supposed to keep his contract alive—which was in accordance with the view, propounded in his testimony, that he had no contract. In January, 1906, he found an opportunity for further speculation upon his interest in the contract, and, having obtained judgment in the suit which Vincent had instituted against him, complied with the condition upon which he had been allowed to do so by transferring two-thirds of that interest to Grosbeck and the remaining one-third to Vincent (if such a remainder could be found, in view of the fact that one-fourth had previously been transferred to Banker). And in July, 1907, Vincent spent two or three weeks, or rather engaged a couple of laborers who spent perhaps that much time, in trifling as Banker had done with the shallow wells. And, then, Vincent abandoned the land, and it was left to the owner, who a year later brought this suit.

[3] The circumstances thus recited, according to our view of the matter, and for the reasons which have been stated, justified the plaintiff in invoking the original nullity of the contract on which defendants rely, even though he, or the former owner of the property, may have been estopped to invoke such nullity at other times and as against other parties. We are, moreover, of opinion that assuming the contract to have been valid, and, waiving the question of its nullity, to which we have just referred, the evidence sufficiently establishes its abandonment by the parties defendant. It is true that abandonment, generally speaking, is a matter of fact and intention, but it may be altogether a matter of fact and law. In the instant case the fact of the abandonment is undeniable. Banker left the field, finally, two years and a half (if not three and a half) before this

suit was instituted, and Vincent a year before. Their presence on the field was a mere pretense from the start, since the drilling of oil wells into each of which one barrel of oil may seep in the course of a day to be then pumped out by hand was not the development that the contract here under consideration contemplated; and the reasons which they give for leaving the field do not bear analysis; that is to say, while they may be sufficient for those who give them, they are insufficient, the whole situation considered, for the purposes of this case, either as showing that Banker and Vincent, when on the field, were there for the execution, according to its spirit and meaning, of the contract on which they rely, or as showing any real necessity for leaving or any real intention of returning. The fact of their abandonment is therefore controlling.

There are other interesting questions in the case, but we do not find it necessary to decide them, as they lose their significance in view of our conclusions—that the contract here attacked was and is null, and that plaintiff has the right to invoke the nullity, and that, whether valid or invalid, the defendants are shown to have abandoned it.

Judgment affirmed.

LAND, J., concurs.