Mae Sterlane et al., Appellees, v. Joseph B. Fleming et al., Trustees, Appellants.

No. 46596.

April 3, 1945.

Rehearing Denied June 22, 1945.

Dutcher, Ries & Dutcher, of Iowa City, and J. G. Gamble and A. B. Howland, both of Des Moines, for appellants.

D. C. Nolan and Swisher & Swisher, both of Iowa City, for appellees.

WENNERSTRUM, J.— ▮ Plaintiffs sought recovery of damages by reason of claimed permanent injuries to Mae Sterlane and her husband, Jack Sterlane, and also for damages to the automobile of the husband, as the result of a highway-crossing collision with one of the defendants' trains. The record discloses that Jack Sterlane has assigned his claim for damages to Mae Sterlane and it is further shown that she has made a partial assignment of her own claim for damages to Charles DeLaChapelle, one of the plaintiffs in this action. The case was submitted to a jury for its consideration, which returned a verdict in favor of the plaintiffs. The defendants' motion for a new trial was overruled and they have appealed.

The collision which resulted in the claimed injuries to the Sterlanes occurred on November 11, 1942, about 4:30 o'clock in the afternoon. This accident happened at a crossing over the railway company's tracks approximately one-half mile west of the town of Homestead. The roadway, the existence of which is in dispute, turns off from U. S. Highway No. 6 and proceeds in a north-and-west direction from the paved highway across the Rock Island right of way and tracks and to a fence and locked gate on the opposite side of the railroad right of way. The highway, at or near the point of the collision, parallels the railroad right of way. The highway and the railroad tracks at the point in question extend in a general easterly and westerly direction.

The roadway which leads from the pavement across the railroad tracks was originally part of the old River to River road. About the year 1920 this road, in the vicinity of the point in question, was changed from the north side of the railroad tracks to the south side. The record shows that on April 17, 1923, the board of supervisors of Iowa county adopted a resolution which provided for the vacation of "the road lying north of The CRI&P Railway in Section 4 in Iowa Township." The Amana Society owned all the land adjacent to the right of way on the north side of the railroad in Section 4. It is shown that fol-

lowing the action of the board of supervisors a fence and gate were built on the north side of the railroad right of way, which gate was kept locked during the greater part of the time. It was locked at the time of the collision. It is further shown that after this gate was put in no maintenance work of any kind was performed, either by the State Highway Commission, by the county, or by any other authority upon the roadway extending from the paved highway to the crossing where the accident occurred. The crossing remained in its original location and was apparently maintained by the railway company. There is no record of any official action being taken by any authority to abandon the roadway between the railroad right of way and the paved highway to the south. The distance from the edge of the pavement to the south rail of the railroad tracks as one progressed along the claimed roadway was approximately ninety-five steps.

I. It is the contention of the appellants that the roadway which extended from the north side of the primary highway to the railroad right of way had been abandoned by the public authorities as a highway. This claimed abandonment is of importance because the evidence shows that the engineer on appellants' train that struck the Sterlane car failed to give the customary crossing whistle. When the fireman on appellants' engine involved in the collision observed the close proximity of the automobile to the track he directed the engineer to give an emergency whistle. This whistle was not a regular crossing whistle. There is no question that the highway on the north side of the railroad right of way had been vacated, but, as previously stated, there is no record of official vacation of the highway south of the railroad right of way. The abandonment, if any, must be deduced from the fact of its nonuse. In this respect the evidence shows that the roadway on the south side of the railroad tracks had been used since the roadway north of the railroad right of way was vacated as a means of access to the timberland on the north side of the right of way. The Amana Society had followed a practice of selling hunting and fishing privileges to individuals. The record shows that the roadway was used by these parties in traveling into the timber

tract on the north side of the railroad property. This tract of land was also used by picnickers who used the roadway in question. It was also used by parties who drove into the north tract during the winter season for the purpose of hauling out ice and timber. The record also shows that this roadway was not worked and it was at times very rutty. It is further shown that it had never been fenced or in any way closed to travel by anyone.

In connection with the matter of claimed abandonment of this roadway in question we call attention to the statement made in 39 C. J. S. 1065, 1066, section 130, where it is stated:

"It is presumed that a highway, once shown to exist, continues to exist. Abandonment is a fact which must be proved and the burden is on the one who asserts abandonment to prove it by clear and satisfactory evidence."

And, in 39 C. J. S. 1066, 1067, section 131, in commenting on a stub-end road, it is stated:

"The abandonment of a part of a highway, regardless of the proportion it bears to the total length, does not constitute an abandonment of the portion still used, even though that portion is a cul-de-sac."

In 25 Am. Jur. 365, section 47, the following statement is made:

"A highway once in existence is presumed to continue until it ceases to be such owing to abandonment or some other lawful cause, and the burden of showing a discontinuance, vacation, or abandonment is on the party who asserts it."

In the case of McCarl v. Clarke County, 167 Iowa 14, 20, 21, 148 N. W. 1015, 1018, this court made the following significant statement in connection with the question of the claimed abandonment of a roadway:

"A road may not be discontinued unless it is vacated, or possibly by abandonment. Abandonment would be a discontinuance in one sense. The question of abandonment of a road involves, not so much the question of time, though after a long time there may arise a presumption. But it involves more the

question of intent and acts of the public. Nonuser is not enough, unless coupled with affirmative evidence of a clear determination to abandon. 37 Cyc. 195. Nor will obstructions or encroachments necessarily work an abandonment. 37 Cyc. 199. Nor does the failure to keep the road in repair necessarily work an abandonment. 37 Cyc. 197; Maire v. Kruse, 85 Wis. 302 (55 N. W. 389, 26 L. R. A. 449)."

Further authorities that support our conclusions will be found in Davies v. Huebner, 45 Iowa 574, 576; Clare v. Wogan, 204 Iowa 1021, 1024, 1026, 216 N. W. 739; Robinson v. Board of Supervisors, 222 Iowa 663, 666, 667, 269 N. W. 921.

We have read the several cases which have been cited us by the appellants bearing upon the question of the abandonment of a roadway. In the cases which they have called to our attention we do not find that the facts are similar to the situation presented in the instant case, and under the rules as previously set forth we are satisfied that the appellants have not proved the abandonment of the highway by such clear and satisfactory evidence as would justify the court in submitting the question of abandonment to the jury. Consequently we have concluded that the court was correct in its instruction that there had not been a vacation or abandonment of the highway and that it was the duty of appellants' train crew to give the statutory warning of the approach of the train. This conclusion is fortified by the fact that the railway company had continued to recognize this crossing as a highway crossing inasmuch as it had maintained the facilities for crossing the track at this point.

██ II. The appellants allege as a further ground of error that the court, in giving one of its instructions, informed the jury, in part:

"* * * that the presence of weeds or brush or trees along the right-of-way of a railway near a crossing which obscure the view of the track by travelers approaching the crossing, is not in and of itself negligence on the part of the railway company, but the jury may consider such fact along with other matters in determining whether or not defendants were negligent."

The appellants claim that this instruction, construed with the allegations of the petition as set out in the statement of

the issues, along with the burden-of-proof instruction, resulted in conflicting statements. It is also contended that a consideration of these instructions together would result in an interpretation that the presence of weeds or other obstructions at a crossing could be the proximate cause of a collision. It is further contended that, when the instructions are so considered, the court was in error in instructing as it did.

We do not feel that the contentions of the appellants can be sustained. Our interpretation of the instructions does not cause us to reach the conclusion that the trial court stated that the presence of the weeds could be the proximate cause of the collision. The instruction heretofore quoted definitely states that the presence of the weeds, brush, or trees along the right of way of the railroad is not in itself negligence on the part of the railway company, but might be considered along with other matters in determining whether the appellants were guilty of negligence.

In the case of Wiese v. Chicago G. W. R. Co., 182 Iowa 508, 514, 515, 166 N. W. 66, 68, this statement is made:

"Whether the company was required generally to keep its right of way at such places free from weeds was not involved. That depends on the location. Allowing weeds which ordinarily do not stand higher than grass along the right of way, and do not obstruct the view, might not amount to negligence; but to permit weeds to grow in the right of way at a private crossing to a height of 6 or 8 feet, where these will be likely to obstruct the view of a person approaching such a crossing, and because of such obstruction expose him to the danger of collision with an approaching train, may be regarded as negligent, *and, with omission to sound any warning of the train's approach, might be found the proximate cause of* a collision and consequent injuries." (Italics supplied.)

It will thus be observed that the trial court in the instant case incorporated in substance the holding in the cited case. In the cases referred to by the appellants, to wit, Anderson v. United States R. Admn., 193 Iowa 1041, 188 N. W. 826; Bruggeman v. Illinois Cent. R. Co., 154 Iowa 596, 134 N. W. 1079,

we held that we do not approve of an instruction which definitely states that the placing of a boxcar on the siding could be the proximate cause of a collision. The court in the present case did not instruct that the weeds and obstructions near the railroad track could be the proximate cause of the collision. What the court did state was that the weeds and other obstructions, if any, near the track might be taken into consideration in determining the negligence of the appellants. In so stating the law as applicable to the instant case we hold there was no error.

III. The appellants present as another ground for reversal the contention that the court gave conflicting instructions in connection with the alleged speed of the train. It is contended that the statement of the issues in the early part of the instructions referred to the speed of the train as one of the elements of negligence and that speed was also inferentially referred to in the burden-of-proof instruction. The appellants claim that these instructions, when construed in connection with other instructions, result in conflicting statements, inasmuch as in certain of the later instructions it is stated that the "movement of a train at a high rate of speed is not, in itself, negligence." In this last-referred-to instruction, as well as in others, the jury was instructed that the rate of speed of the train might be taken into consideration in connection with all other matters relating to the circumstances, situation, location, and visibility of the crossing, and lack of signals, in determining whether or not the appellants' train crew was negligent.

It is our conclusion that the instructions as presented by the trial court do not justify the interpretation that the appellants seek to make.

The criticism which the appellants make of the instructions relative to speed is, in substance, the same criticism which they made of the instructions relative to the claimed obstructions and weeds. Our comments as set out in Division II of this opinion relative to the several instructions are somewhat applicable to the situation presented in connection with the criticism of the instructions relative to speed. We do not believe that this criticism can or should be sustained. Our conclusions find support in several Iowa authorities. In the case of Kinyon v.

Chicago & N. W. Ry. Co., 118 Iowa 349, 359, 92 N. W. 40, 43, 96 Am. St. Rep. 382, this court stated:

"The great purpose to be subserved by railroads is promptness, speed, and dispatch in carrying passengers and freight; and under ordinary circumstances, in the open country, there is no duty resting upon the companies to slacken the pace of their trains at crossings. To hold otherwise, so long, at least, as grade crossings are the rule instead of the exception, would be to neutralize and to a great extent destroy the advantages derived from modern facilities for transportation. But the right thus conceded is not without its attendant obligations, and if by reason of natural or artificial obstructions to the view of the traveler upon the highway, or of the course of the track around curves or through high embankments, the crossing is of peculiar or extraordinary danger, the operation of the railway must be conducted with reference to that fact."

In Hartman v. Chicago G. W. Ry. Co., 132 Iowa 582, 586, 110 N. W. 10, 11, we stated:

"As has often been said, no rate of speed in a train moving in the open country is in itself negligence as to a person upon a crossing, but it sometimes happens, when considered with reference to the circumstances of the particular place, that the rate of speed may be an important factor in determining whether due care has been exercised. Kinyon v. Railroad, 118 Iowa 349. Whether, in view of the location of this particular crossing at the end of a deep cut, the obstructions, if any, to the view of the approaching traveler, the failure to sound signals of warning, and other attendant circumstances, the rate of speed in this instance had any tendency to indicate a want of reasonable care on part of the defendant was a question of fact and not of law."

In the case of Graves v. Chicago, R. I. & P. R. Co., 207 Iowa 30, 36, 222 N. W. 344, 347, it is stated:

"We have many times held that speed in the open country is not an independent ground of negligence, but that, at places of peculiar or extraordinary danger, it may become a material

factor, in connection with other facts and circumstances, in determining whether due care has been exercised. Gray v. Chicago, R. I. & P. R. Co., 143 Iowa 268; Artz v. C., R. I. & P. R. Co., 44 Iowa 284; Cohoon v. Chicago, B. & Q. R. Co., 90 Iowa 169; McKonkey v. C., B. & Q. R. Co., 40 Iowa 205; Kinyon v. Chicago & N. W. R. Co., 118 Iowa 349; Rutherford v. Iowa Cent. R. Co., 142 Iowa 744; Bruggeman v. Illinois Cent. R. Co., 154 Iowa 596; Hartman v. Chicago G. W. R. Co., 132 Iowa 582.''

By reason of the authorities quoted it is our conclusion that there was no error in the instructions to which criticism has been directed.

IV. The appellants particularly contend that the court committed error in its failure to direct a verdict for them at the conclusion of the appellees' evidence, and again at the conclusion of all the testimony, it being urged that the evidence failed to show that the occupants of the automobile were free from contributory negligence and that their negligence was affirmatively shown. It is axiomatic that in considering a motion for a directed verdict the evidence must be construed most favorably to the party against whom the motion is directed. We have also held that where the facts are in dispute we are not justified in approving a directed verdict. Particularly is this true in this case, in the light of certain portions of testimony.

Roy Gaddis, one of the witnesses for the appellees, testified:

''On that day there was a lot of weeds on the south side of the railroad tracks. I would say these weeds were from 6 to 10 feet from the shoulder on the south side of the track. I could not see over the weeds from my position in the car as I approached the tracks there. They were just simply too high. The weeds were the worst on the right-hand side, going in. * * * Q. How close would you say you would have to get to the south rail of the track before you could see around those weeds? A. Well, my car was clear on the track before I could see.''

This witness further testified:

''I would say there was small trees within 8 or 10 feet of the railroad track. Those trees within 8 or 10 feet of the rail-

road track would probably be 4 or 5 feet tall, brush you might call it. I think the weeds and brush along the lane-roadway began about 30 feet north of the paved roadway."

He further testified:

"I would say trees start between 10 feet of the railroad track and run back, roughly, I don't know. I know there are some straggling trees probably some 15 or 20 feet back a ways."

The witness Adolph Halgren, a state highway patrolman, testified, in part, as follows:

"In my best judgment, I would say that the weeds and undergrowth that I described were about 20 feet or thereabouts from the railroad track. As to the distance a person traveling on that lane that leads to the railroad crossing could see the railroad track, I didn't measure it. Q. What would be your best judgment on that? A. When the road turns to an angle headed west approximately 30 feet, probably."

He further testified:

"I think the weeds and undergrowth came within about 20 feet of the railroad, approximately."

He also stated:

"I don't believe that there was any weeds 7 feet high that were within 20 feet of the railroad track. * * * These weeds tapered off as you got up closer to the railroad, and there may have been some scattering weeds in the last 50 feet or so that were higher than the rail in front of the jury box— maybe just one sticking up now and then."

Adolph Berger, who was one of the witnesses for the appellees, testified, in part, as follows:

"That particular day I observed that there was vegetation there, which obscured the view of the railroad track."

William Lipman, a further witness for the appellees, testified:

"I would say that weeds and brush extended to within

about 15 to 25 feet of the railroad track on the easterly side of this roadway. * * * I would say that you could not see the railroad track to the north and east until you got within a distance of 15 to 25 feet of the track."

Jack Sterlane testified:

"It would be my best judgment that the weeds and brush came up to probably 7 or 8 feet from the south side of the south rail. They would obstruct your view as you approached the railroad track, coming from the pavement, while driving an automobile."

He further testified:

"When you start up this little incline, veering to the west, you had a reasonable view to the west at about 30 or 35 feet. When I got to a point where I could look east, I did look to the east. I saw nothing there in my range of vision."

This witness also testified:

"The last 60 to 80 feet of that approach along the lane-roadway leading to the crossing is upgrade, but the principal incline is probably 30 or 40 feet from the track."

He also testified:

"As I drove up there toward the crossing, when I looked to the east I think that the driver's seat of my automobile would be about 30 or 35 feet from the track. * * * When I got up there at the time I looked I could see to the east in the neighborhood of 100, perhaps 200 feet. * * * When I was from 30 to 35 feet from the crossing, I claim that I looked to the east along the track as far as I could see. The distance of from 100 to 200 feet was approximately as far as I could see."

Mae Sterlane testified:

"I would say that you would have to get the length of two automobiles from the railroad track before you could see around these weeds and brush east along the tracks. I should say automobiles are maybe 12 to 15 feet long."

It is true that there was evidence presented by the appellants which very definitely contradicted the statements of the witnesses who testified on behalf of the appellees. The photographs of the scene of the accident, which were taken three days following, do not disclose the obstructed view of which certain witnesses for the appellees have testified. However, it is not the province of this appellate court to pass upon the disputed questions of fact, and under the circumstances as presented by the record, particularly in light of the fact that no crossing signal was given, it is our conclusion that we would not be justified in saying that it was error for the trial court to overrule the motions for a directed verdict. Appellants have cited a number of our cases wherein a directed verdict was affirmed, but, as has often been said, each case must stand upon the facts as therein presented. We therefore hold that there was no error in the trial court's submitting the fact questions to the jury.

V. There are other contentions on the part of the appellants regarding instructions and the refusal to give a requested instruction but we do not believe that under the record in this case they present reversible error.

Upon a review of the entire record, as well as the contentions of the appellants, we have concluded that the case was properly submitted to the jury and that there was no error in the record that would justify a reversal. We therefore affirm. —Affirmed.

OLIVER, BLISS, GARFIELD, and MULRONEY, JJ., concur.

SMITH, J., concurs in result.

MANTZ, HALE, and MILLER, JJ., dissent from Division I.

MANTZ, J. (dissenting)—I desire to dissent from Division I of the majority opinion. That division approves an instruction relating to the character of a crossing over the railway right of way of appellants about one-half mile west of the town of Homestead, Iowa County, Iowa. It was at this crossing the injuries claimed took place.

Appellees claimed that the crossing in question was a

public crossing over the railroad right of way and that appellants were negligent in that the train which struck and injured appellees failed to give the statutory signals required: ringing a bell and sounding a whistle.

Appellants claimed that the crossing was a private one; that by reason of a change in the highway about twenty years before said crossing, insofar as it was public, had been abandoned. The case was tried on that theory. Appellants requested an instruction that the crossing was a private farm crossing and not a public highway crossing. The court refused this request and instructed the jury that:

"* * * the railroad crossing involved in this case is a public crossing and that the road leading to and across it is a road that is and can be used by the public. You are to so regard it in arriving at a verdict in this case."

Appellants excepted to the action of the trial court in refusing the requested instruction, and also to the one given by the court.

Thus the court told the jury as a *matter of law* that the crossing was a public one, thus making it mandatory that a locomotive approaching such crossing give the statutory signals.

The majority opinion holds that the trial court did not err in giving such instruction. I think that under the record it appears that the crossing was a private one and at the very least appellants were entitled to have the jury pass upon the question. It seems to me that there was abundant evidence to require the submission of that question to the jury.

Before dealing with some legal principles which I think have present application, I desire to set forth from the record some facts in addition to those set forth in the majority opinion with reference to the claim made by appellants.

As stated in the majority opinion, the accident happened at a railroad crossing about one-half mile west of Homestead, Iowa. At that point and for some distance to the east and west Highway No. 6 parallels the railroad right of way, being on the south side thereof. To the east of such crossing about 120 rods and between the railroad and the paved highway there is

a cemetery, which, however, cannot be seen from the crossing. At this crossing the south railroad line and the north highway line coincide; there is no private land between. Prior to about 1921, the highway was generally known as the "River to River" road, and went west of Homestead on the south side of the railroad and at the point involved crossed the right of way to the north side thereof and proceeded west approximately a mile, where it again crossed the railroad right of way to its south side and proceeded westward. About 1921, in order to avoid the two grade crossings, the entire road was shifted to the south side of the railroad and the part formerly used on the north side was vacated and was acquired by the Amana Society. Later Highway No. 6 (the old River to River road) was paved and became one of the principal roads of the highway system. The highway records show the elimination of the road to the north of the railroad track on August 29, 1921, and its vacation to the Amana Society. Since that time no work has been done by the public on that crossing. The railroad did not maintain the usual and customary crossing signs. Following the disuse of Highway No. 6 north of the railroad track the old crossing was used as ingress to and egress from the private lands on the north side of the railroad. To the north were open fields, cropped or pastured, some timber, and a small pond or lake. Jack Sterlane, who was the owner and driver of the auto figuring in the collision, lived on the lands of the Amana Society to the north of the highway and had the status of a ground keeper. The gate on the north end of the crossing was erected by the Amana Society after they acquired the land to the north formerly used as a highway. It was kept padlocked much of the time and persons crossing to the private land had to obtain the key to this lock in order to go through the gate. The distance south from the center of the railroad to the center of the paved highway was about two hundred and twenty-five feet. The road or lane which leads from the paved highway across the track to the Amana Society gate runs entirely on the highway and the railroad grounds. It does not go directly north from the paved road to the railroad right of way but leaves the paved slab about five hundred and seventy feet east from the crossing and

runs north and northwest in a diagonal direction. Some of the witnesses referred to this road from the highway to the crossing as a lane: narrow, irregular, rutted, and unworked. Jack Sterlane, driver of the car, said that the road had deep ruts and high centers. He further stated that he had no knowledge of any work being done on the lane by way of repairing it and keeping it in shape. The appellee Mae Sterlane, as a witness, said: "We turned north off Highway No. 6 onto the lane and after turning the roadway just meanders over to the railroad."

W. K. Chantry, county engineer for Iowa county since 1929, testified without contradiction that to his knowledge there had been no county maintenance on this lane. He further stated that to his knowledge no official or agent of Iowa county ever claimed that the lane leading off north of Highway No. 6 was a county road. The Amana Society owned the land north of the crossing; they erected and maintained a fence along the north side of the railroad ground; erected and maintained a gate at the north end of the crossing and kept it padlocked during a large part of the year; they allowed people to enter their land through the gate to haul out wood and ice; they issued permits to hunters and fishermen to go upon their land through this gate entrance; without such permission no one had a right to enter. Jack Sterlane, game warden for the Amana Society, lived on their lands to the north of the railroad and used this gate to go to and from his place and carried a key to the gate lock. He testified that he had no knowledge of any work being done on the lane. Louis C. Selzer, aged fifty-three, farm manager for the Amana colonies, said that he had known the crossing since he was a boy; that right after the new road was established the gates were put up at the north end of the crossing. He was asked the following question:

"And since the time the gate was put up there at this crossing and at the crossing to the west, that stretch of road in there has not been maintained or worked by the State Highway Commission or by the County or by any other governmental body, has it? A. No, it has only been used as it was left."

He further stated that the lane was narrow, was rough and

rutted: "Nobody takes care of it." There were no planks at the crossing. On a few occasions the railroad put some gravel at the crossing. It was very rough with the rails much higher than the surrounding ground. He stated that it was a part of Sterlane's job to keep "unauthorized persons" out of the land belonging to the Amana Society.

The evidence stands uncontradicted that following the change of Highway No. 6 to the south side of the railroad there was no work of any kind done on the crossing or the approaches thereof; that it ran in an irregular manner to the north and northwest, with turns and angles; that it became a narrow lane full of ruts and cuts. In some places there was not room for cars to meet or pass. No governmental agency claimed it, or exercised dominion or control over it. For a period of about twenty years it was neglected and unused save as permitted by the Amana Society, owners of the land to the north. They barred the way to the public by fence and gate and those seeking to enter had to get permission.

Our statute recognizes two kinds of crossings over railroads: public and private. Section 8018 refers to the public crossings and section 8011 refers to private crossings.

Section 8018 requires that warning signals be given at any "road crossing." The authorities hold that this means a public crossing. Nichols v. Chicago, M. & St. P. Ry. Co., 125 Iowa 236, 100 N. W. 1115; Weaver v. Chicago & N. W. Ry. Co., 146 Iowa 149, 124 N. W. 1088; Ressler v. Wabash R. Co., 152 Iowa 449, 132 N. W. 827.

As before stated, the trial court held as *a matter of law* the crossing was a public crossing. The majority opinion affirms that instruction. In considering the authorities cited it is to be kept in mind that the highway is immediately south of the one-hundred-foot railroad right of way. The lane which leaves the pavement is over five hundred feet long and is irregular, winding, rough, rutted, narrow, and crosses the two rails and finds itself confronted by a fence and locked gate on the north side of the right of way. To enter No. 6 from the north there was no primary-road stop sign. This fence and gate have been there close to twenty years. The majority opinion holds that the one

hundred feet. was a public highway. It had to the north an obstructed dead end.

I will call attention to some authorities dealing with the public and public rights as related to roads and highways, and following this, authorities as to what is an abandonment, how it may arise, and how determined.

The term "public" means: "Pertaining to a state, nation, or whole community * * * Open to all * * *. Common to all or many; general; open to common use." Black's Law Dictionary, Third Ed., 1460.

"Public," as applied to highways, means: "A free and public road, way, or street; one which every person has the right to use." Black's Law Dictionary, Third Ed., 893. See, also, Town of Kenwood Park v. Leonard, 177 Iowa 337, 158 N. W. 655; Palatka & I. Ry. Co. v. State, 23 Fla. 546, 3 So. 158, 11 Am. St. Rep. 395; State v. Gross, 119 N. C. 868, 26 S. E. 91.

In Allen v. Jones, 47 S. D. 603, 605, 201 N. W. 353, 354. the court said:

"The word 'highway' * * * means a roadway or driveway that can be used for public travel. It does not mean a mere right of way upon which a road can be or is being constructed."

"To be a public highway, it must have a terminus, a quo the public can enter it, and a terminus ad quem they can leave it." Manigault v. S. M. Ward & Co., 4 Cir., S. C., 123 F. 707, 713, affirmed 199 U. S. 473, 26 S. Ct. 127, 50 L. Ed. 274. See, also, Coulter v. Great N. Ry. Co., 5 N. D. 568, 67 N. W. 1046.

That the crossing was one which was used by certain individuals is not in dispute. As to appellants' claim that there were in the record facts and circumstances which raised a fact question as to whether there had been an abandonment of the place as a *public crossing,* I will cite authorities from this and other jurisdictions.

Abandonment involves an intent and purpose to surrender the right acquired, accompanied by acts indicating that purpose and intent; it is a question of fact and not of law. 1 Am. Jur. 12, section 18; Ray Coal Mining Co. v. Ross, 169 Iowa 210, 151 N. W. 63.

It is a relinquishment, renunciation, or surrender to right. Kladivo v. Melberg, 210 Iowa 306, 227 N. W. 833; Pitzenberger v. Schnack, 215 Iowa 466, 245 N. W. 713.

Whether there has been an abandonment in fact is to be determined from the evidence. Wilson v. Daniels, 79 Iowa 132, 44 N. W. 246.

"[The statute] contemplates the abandonment of the highway in place of which the new one is established." Stahr v. Carter, 116 Iowa 380, 382, 90 N. W. 64, 65.

Abandonment is a fact question. Bradley v. Appanoose County, 106 Iowa 105, 76 N. W. 519. See, also, Robinson v. Board of Supvrs., 222 Iowa 663, 269 N. W. 921.

When part of a road is cut off by straightening, or changed by relocation, the easement of the public therein is terminated. Clark v. State, 95 Ind. App. 667, 173 N. E. 233; Ayer v. Kirkwood, 9 La. App. 306, 119 So. 475; 39 C. J. S. 1070, section 134; Robinson v. Board of Supvrs., supra, 222 Iowa 663, 269 N. W. 921.

"That a highway which has been duly and legally established may be abandoned by the public and its rights therein lost is settled * * *." Lucas v. Payne, 141 Iowa 592, 596, 120 N. W. 59, 61.

The Robinson case on this question (abandonment) quotes from McCarl v. Clarke County, 167 Iowa 14, 148 N. W. 1015.

In Lucas v. Payne, supra, on the question of abandonment of a highway the court said:

"That a highway which has been duly and legally established may be abandoned by the public and its rights therein lost is settled beyond any controversy by our own cases * * *." Citing Larson v. Fitzgerald, 87 Iowa 402, 54 N. W. 441; Weber v. Iowa City, 119 Iowa 633, 93 N. W. 637; Carter v. Barkley, 137 Iowa 510, 115 N. W. 21.

"Nonuser is not enough to constitute an abandonment unless coupled with affirmative evidence of an intention to abandon." Schultz v. Stringer, 168 Iowa 668, 677, 150 N. W. 1063, 1065. Citing McCarl v. Clarke County, supra. See, also, Clare v. Wogan, 204 Iowa 1021, 216 N. W. 739; Beim v. Carlson, 209 Iowa 1001, 227 N. W. 421.

"An 'abandonment' is defined as a relinquishment or sur-render of rights or property by one person to another * * * It includes both the intention to abandon and the external act by which the intention is carried into effect." Words and Phrases, Perm. Ed., 55.

"In a technical sense the word means the relinquishment of a right; the giving up of something to which one is entitled; the giving up of a thing absolutely without reference to any particular person or purpose." Ballentine Law Dictionary, 1.

"Many cases have defined the term 'abandonment' as used in law, but in all of them will be found that intention is an element of abandonment." Albert, J., in Pitzenberger v. Schnack, 215 Iowa 466, 470, 245 N. W. 713, 715.

The case of Ferguson v. Ray, 44 Or. 557, 77 P. 600, 1 L. R. A., N. S., 477, 102 Am. St. Rep. 648, 1 Ann. Cas. 1, is authority that whether something has been abandoned is a fact question.

"It is true that abandonment, generally speaking, is a matter of fact and intention, but it may be altogether a matter of fact and law." Gray v. Spring, 129 La. 345, 363, 56 So. 305, 312, Ann. Cas. 1913B, 372.

"Whether a party has abandoned his right to an easement is a question of fact and intention proper for the decision of a jury." Southern Ry. v. Howell, 89 S. C. 391, 395, 71 S. E. 972, 973, Ann. Cas. 1913A, 1070, citing Lorick & Lowrance v. Southern Ry. Co., 87 S. C. 71, 68 S. E. 931.

Last cited was a law action and submitted to a jury. This case is cited as authority in Orr v. O'Brien, 77 Iowa 253, 42 N. W. 183, 14 Am. St. Rep. 277. Cited in Southern Ry. v. Howell, 89 S. C. 391, 71 S. E. 973; Parkins v. Dunham, 3 Strob. L. (S. C.) 224.

In Parkins v. Dunham, 3 Strob. L. (S. C.) 224, 228, the question was as to an abandonment of a certain easement. There was involved the question of nonuser. Also there was raised the question of a presumption of abandonment due to lapse of time. In discussing the issues, the court said:

"I would not venture therefore to fix any time for proving,

by a *non-user,* the abandonment of such an easement: But it would appear to be always for the consideration of the jury. as a question of fact and intention.''

In that case the court instructed the jury as a matter of law as to an abandonment. Held error, the court saying that it was a proper jury question, ''And on this ground alone, a new trial is ordered.''

In view of the undisputed facts in this case showing close to twenty years nonuse of this crossing by the general public, no claim thereto by any public official of Iowa county, no work of any kind whatsoever done thereon, a five-hundred-foot strip, narrow, winding, irregular, rough, and rutted, I think that there was at least a jury question, and that for the court to instruct the jury that under the record it was a public crossing was an error calling for a reversal of the case. I would reverse.

HALE, C. J., and MILLER, J., join in this dissent.