# CHARLESTON

LAING *et als.* v. PRICE *et als.*

Submitted September 29, 1914.   Decided October 29, 1914.

1. JUDGMENT—*Conclusiveness—Uncertainty in Decree.*

   A decree sustaining a general demurrer to a bill in equity, stating no grounds of demurrer, reciting lack of equity in the bill, and dismissing it, before any answer has been filed or issue of fact is raised, is not conclusive in an action at law between the same parties upon a cause of action arising out of the facts stated in the bill.   (p. 193).

2. SAME.

   Uncertainty in a judgment or decree, as to the ground upon which it was based, renders it inconclusive in subsequent litigation between the same parties upon the same demand.   (p. 193).

3. SAME—*Construction—Ambiguity.*

   Ambiguity in a decree as to the ground of the decision authorizes resort to the record of the cause for solution thereof.   (p. 193).

4. MINES AND MINERALS—*Mining Lease—Implied Surrender.*

   An implied surrender of a mining lease does not arise from mere notice of intention on the part of the lessee not to pay further rentals and to give up the lease and his failure to make such payments.   (p. 195).

5. SAME—*Mining Lease—Surrender by Corporation.*

   An express surrender of such a lease by a corporation requires corporate action.   (p. 196).

6. SAME—*Mining Lease—Surrender—President of Corporation.*

   The president of a corporation has no inherent power to surrender a mining lease belonging to it.   (p. 196).

7. CANCELLATION OF INSTRUMENTS—*Mines and Minerals—Mining Lease—Equitable Relief—Proceedings—Proof.*

   Parol proof of a ground of relief from the obligation of a written

contract must be clear and strong enough to establish it to the entire satisfaction of the court. (p.199).

8.  SAME—*Proceedings—Equitable Relief—Proof of Grounds.*
    The plaintiff in such a case must show the adoption and diligent pursuit of all reasonably practicable means to eliminate all doubt and uncertainty as to the existence of such ground. (p. 199).

Appeal from Circuit Court, Raleigh County.

Bill by Susan K. Laing and others against S. Lewis Price and others.  From a decree for defendants, plaintiffs appeal.

*Affirmed.*

*W. R. Thompson, J. T. Laing, File & File* and *Sanders & Crockett,* for appellants.

*Henry Gilmer, T. N. Read, Samuel Price* and *R. S. Spilman,* for appellees.

POFFENBARGER, JUDGE:

The two-fold purpose of the bill in this cause, rescission of a coal lease and restraint, by injunction, of an action of assumpsit to recover minimum rentals accrued on it and in arrears, was defeated by dissolution of the preliminary injunction and dismissal of the bill.

Additional grounds of relief, set up in the bill, were an alleged bar of the right of the defendants to the stipulated rentals; by a former adjudication, and an alleged termination of all rights under the lease by surrender thereof.  The ground of rescission was alleged non-existence, in the leased land, of coal of the quantity and quality contemplated by the parties, at the time of the execution of the lease.

The history of the lease and some of its material provisions are narrated in the opinion in *Beckwith* v. *Laing,* 66 W. Va. 246.

The adjudication relied upon as extinguishment of the rights of the defendants under the lease and affording ground for the injunctive relief sought, is the decree in *Price et al.* v. *Laing, Admr.,* affirmed by this court, as shown by the decision reported in 67 W. Va. 373.

That decree expressly sustained a demurrer to the bill and then dismissed it in general terms, making no reservation of

right to sue in another forum or a different form of action.
Analysis of the numerous decisions invoked in the argument
in support of the allegation of conclusiveness of the decree
is unnecessary.  Most of them merely declare general prin-
ciples of *res judicata* and apply them under conditions and
circumstances differing from those disclosed here.  As the
demurrer could have been sustained on the ground of lack of
equity jurisdiction, and not on the ground of lack of legal
right in the plaintiffs, arising out of the facts stated, the
court may have sustained it upon that ground.  In other
words, it is obvious that the decision on the demurrer
may have gone no further than to deny the appropri-
ateness or validity of the remedy chosen.  That was the first
defense raised by the demurrer.  To get to the merits, the
court would have been bound to pass over it.  Inappropriate-
ness of the remedy, if found, warranted dismissal of the bill.
An adjudication on the merits, adverse · to the plaintiffs,
would have called for the same order.  No language of the
decree shows upon which ground it was entered.  The recital
of lack of equity, in the bill, in the opinion of the court,
does not disclose it.  These general and indefinite terms are
susceptible of interpretation, and may mean either that the
remedy was not in a court of equity, or that the facts stated in
the bill conferred no right.  Hence, as to the ground of dis-
missal, the decree is ambiguous.  This element of uncertainty
alone deprives the adjudication of the force and effect claimed
for it.  "Where in an answer various matters of defense
are set forth, some of which relate to the maintenance of
the suit, and others to its merits, and there is a general decree
of bill dismissed, it is impossible to hold the decree a bar to
further proceedings.  This is because it is uncertain upon
what ground the bill was dismissed."  Herman, Est. & Res
Judicata, p. 474, sec. 404, citing *Foster* v. *Busteed*, 100 Mass.
409, which fully sustains the text.  See also Van Fleet's
Form. Adj., p. 667, sec. 309, and authorities there cited, in-
cluding *Griffin* v. *Seymour*, 15 Ia. 30, and *Kleinschmidt* v.
*Binzel*, 14 Montana 31.  In conformity with this principle,
it was held, in *Poole* v. *Dilworth*, 26 W. Va. 583, that "A
decision upon a demurrer, though it be but a decree dismiss-

ing the plaintiff's bill, will be conclusive of every matter
whether specially stated in the bill or not, provided it is
clear, that such matter was necessarily in controversy in the
suit and was decided in it, otherwise such decree will not
be conclusive of such matter." Furthermore, the ambiguity
justifies resort to the record for aid in the interpretation of
the decree. *St. Lawrence Co.* v. *Holt and Mathews,* 51 W.
Va. 352, 376; Herman, Est. & Res. Judicata, p. 470, sec. 402.
Recourse to it shows no issue upon any matter of fact. There
is nothing in it but the bill, demurrer and decree. It would
be unreasonable to say the court refused a decree for money
due upon a solemn covenant to pay it, exhibited with the bill,
and not denied or impeached in any manner whatever.
Upon the general demurrer stating no grounds, lack of rem-
edy in equity could be urged, and, being obvious, it was
presumptively the ground upon which the demurrer was sus-
tained. Had an answer been filed and proof taken, or, had
the demurrer been overruled expressly or impliedly and a
decree pronounced in favor of the plaintiffs, the question
would take an entirely different form and would fall under
different rules of disposition.

The allegation of a surrender of the lease wholly fails for
want of proof. It was assigned by James Laing, the lessee,
to Isadore Meadows, who, it is said, re-assigned it to the
New River Fuel Company. That company, through one of
its subsidiaries, paid the stipulated rentals accrued under
the lease from January 1907 to October 1907, and taxes on
the land, amounting in the aggregate to about $2400.00.
After the decision in *Beckwith* v. *Laing,* 66 W. Va. 246, in-
volving an alleged assignment of the lease to Beckwith, trus-
tee, it ceased to make further payments, and S. Dixon, pres-
ident of the company, notified one of the plaintiffs that no
further royalties would be paid, because the lease had been
cancelled in said suit and the prospecting done by the com-
pany had revealed a lack of coal in workable quantities.
Beckwith did not amend his bill, and his suit was dismissed.
The decree in his favor which the court reversed would have
compelled the Laings to assign the lease to him and taken
it from the New River Fuel Co., if it had not been reversed,

but there was no cancellation of the lease and the reversal rendered the decree harmless to the New River Company. Nor was there any formal or legal surrender thereof. Mr. Dixon's mere verbal notice of intention to give up the lease and not pay further rentals did not constitute one. No authority in him to make a surrender is shown, and, moreover, he does not claim to have made a formal surrender either verbally or in writing. Non-payment of the rentals vested right in the lessors, by express provisions of the lease, to forfeit it, but they did not do so. On the contrary they have affirmed its continued existence by their efforts to enforce payment of the rentals. There was no abandonment of actual operation under the lease, for none was ever commenced. If there had been and the lessors had re-entered or executed a new lease, these circumstances would establish an implied surrender. *Sult* v. *Hochstetter Oil Co.*, 63 W. Va. 317. An express surrender would require corporate action. The joint action of the parties is essential to such a surrender. Here we have the act of only one of them. The president of the company had no inherent authority to make it. We do not say whether the lessee has an absolute right to surrender in the first half of the term.

The plaintiffs say they were entitled to relief, if the coal is not of the thickness of vein, persistency and quality requisite to profitable mining, because both parties believed it to be so, at the time of the execution of the lease, and their mutual mistake and failure of consideration afford two well recognized grounds for equitable relief by way of rescission. On the other hand, it is said the contract was one of hazard on the part of the lessee, he having bound himself to pay the stipulated rentals for the term created by the lease and the chance of profit from the mining of the coal if there happened to be any. The covenants to pay fixed or minimum rentals, found in many contracts of lease of mineral lands, have been held to be absolute and enforced accordingly. *Lehigh Z. & I. Co.* v. *Bamford*, 150 U. S. 665; *Ridgely* v. *Conewago Iron Co.*, 53 Fed. 988; *Timlin* v. *Brown*, 158 Pa. St. 606; *Ridgeway* v. *Sneyd*, *Kay*, 627, 69 Eng. Reprints, 266; *Phillips* v. *Jones*, 9 Sim. 519, 59 Eng. Reprints, 458; *Palmer* v. *Wall-*

*bridge,* 15 Can. Sup. Ct. 650. In the most of these cases, however, the lessees resisted payment of the rentals, while remaining in possession of the leased property, or, the mines were open at the dates of execution of the contracts and the quality of the products known. Numerous other similar contracts, leasing unknown and undeveloped territory, or containing terms of express or implied warranty, have been relieved against in equity on the ground of mutual mistake and failure of consideration. *Carl* v. *Granger Coal Co.,* 69 Ia. 519; *Fritzler* v. *Robinson,* 70 Ia. 500; *Carr* v. *Whitebreast Fuel Co.,* 88 Ia. 136; *Cook* v. *Anderson,* 36 W. Va. 174; *Muhlenberg* v. *Henning,* 116 Pa. St. 138; *Boyer* v. *Fulmer,* 176 Pa. St. 282. Generally the interpretation depends upon the circumstances of each particular case as well as the terms of the contract.

Failure of proof of non-existence of coal in the land and of unfittedness thereof for the markets in point of quality dispenses with necessity of inquiry as to classification of this contract with reference to the character of the rental covenant. That there is coal in the land is fully proven. In fact it is not denied by any witness introduced. The objection is that no vein is sufficiently thick and clean to enable the lessees to operate it profitably. But the evidence adduced to prove the allegation is speculative and uncertain in character. There has been no real effort on the part of the lessees to determine whether any of the veins are susceptible of advantageous mining. No entry has ever been driven, shaft sunk on the premises or core taken from the land, far enough back from the out-crop to reveal the true character of the seams. The prospecting has been limited to the out-crops of the seams on the leased lands and others adjoining them. Some of the openings were made under the direction of expert mining engineers and others were old ones from which coal had been mined for local domestic purposes. The best known veins are locally called the Halstead and Tolly, the latter being lower than the former, near stream-level and apparently identical with one known as the Fire Creek seam and successfully worked in other territory. The engineer employed by the plaintiffs reports this vein as being, at one

place examined by him, 55½ inches thick, with a fire clay parting of 8½ inches; at another, 62 inches, with a fire-clay parting of 7 inches; at another, 46 inches, with a fire-clay parting of 8½ inches; at another 28 inches, with two partings, ½ and ¾ of an inch, respectively; at another, 39½ inches; at another 54½ inches, with 6½ inch parting; and at another, 20 inches. The engineer employed by the defendants shows this vein ranging from 39 inches of coal and a 7 inch parting to 66 inches coal and an 11 inch parting. None of these openings are on the Price land. Most of them are west of it. One directly north shows 39 inches of coal; and one directly east, 44 inches of coal and an 8 inch parting. At a point three miles or more south of it, tests made by the plaintiffs indicate less coal and a poorer quality. Below this vein and 250 to 300 feet below the stream level, the Pocahontas vein, successfully worked in other sections, is found near this land and no doubt underlies the entire tract. It is claimed the tests made on adjacent and neighboring lands west of the tract show the veins, particularly the Fire Creek or Tolley, grow thinner as the Price tract is approached, but it evidently extends entirely through the land at a thickness of not less than three feet, and the evidence proves characteristics of this seam are persistency and variableness, as it never wholly disappears but varies greatly in size within short distances. The character of the parting in it is a subject of considerable conflict in the evidence; some of the witnesses insisting it is not separable from the coal and others that it is. The latter say it is rock but quickly disintegrates on exposure, while the former contend it is clay which cannot be kept out of the coal in the mining thereof, except at great expense. As the openings are shallow, the true character of the parting is likely not known by anybody. Another serious conflict arises over the suitableness of the coal for profitable mining. This is practically all expert opinion evidence, and all the witnesses on both sides seem to be well qualified. Merrill, Krebs and Venable, all mining engineers who have had long and varied experience as such, some of it in the regions in which this land lies, testified affirmatively. They are supported by the evidence of Dawson, Gillie, Lee and others who have had large experience in coal mine operations, not all of it in

the New River section, but in this state, and some of it in the New River field. Some of the opposing witnesses are connected with the New River Fuel Co., the alleged assignee of the lease, and one was a relative of the plaintiffs. In point of experience as engineers and operators in that immediate section, they seem to excell the witnesses on the other side. But their opinions on this question must be taken subject to established physical facts of weighty import. One very considerable vein of coal, at least, runs through the land. Its exact character in the land has not been revealed, nor has that of the parting been substantially shown. All of this opinion evidence is highly speculative and conjectural.

The plaintiffs carry the burden of proof. They seek relief from a solemn agreement imposing heavy obligations upon them and securing large advantages to the defendants. To make out a case for such relief, the proof must be clear and convincing. The creation of a mere doubt or suspicion does not suffice. Parol proof of a ground of relief from the obligation of a written contract must be clear and strong enough to establish it to the entire satisfaction of the court. *Fishback* v. *Ball,* 34 W. Va. 644; *Allen* v. *Yeager,* 17 W. Va. 128; *Jarrell* v. *Jarrell,* 27 W. Va. 743; *Smith* v. *Patton,* 12 W. Va. 641; *Armstrong* v. *Bailey,* 43 W. Va. 778; *Trustees* v. *Blair,* 45 W. Va. 812; *Sigler* v. *Beebe,* 44 W. Va. 587. An obvious corollary of this general rule is that the plaintiff in such a case must exercise diligence to remove doubts and uncertainties. As he is bound to prove his case clearly and fully, he must do what is reasonably practicable toward the elimination of uncertainty. That has not been done here. Deeper openings would have disclosed the true character of the parting, and, if made on the land, by means of a core-drill, they would have put beyond question the thickness of the veins as well as the character of the coal. Under the rules of law governing such cases, the evidence is clearly insufficient to make out a case for relief, under the contract as interpreted by the plaintiffs themselves, and we need not ascertain the correctness of that interpretation.

These conclusions result in an affirmance of the decree complained of.

*Affirmed.*