ELLA GRAHAM, Guardian and Curator of AGNES BELL KARR, a Person
of Unsound Mind, v. JAMES M. KARR, JR., and VIVIAN KARR,
Appellant.—55 S. W. (2d) 995.

Division Two, December 31, 1932.

1158

*Gilbert Barlow* and *Frisby & Frisby* for appellant.

*O. J. Adams* and *D. E. Adams* for respondent.

COOLEY, C.—Action to determine title and for partition. The circuit court determined the interests of the parties in favor of the claim of defendant James M. Karr, Jr., and adversely to those of plaintiff and defendant Vivian Karr and rendered interlocutory judgment of partition accordingly. Defendant Vivian Karr alone appealed from the judgment. The plaintiff has made no appearance in this court. When we speak of respondent herein we shall have reference to James M. Karr, Jr.

Agnes Bell Karr is the widow and defendants James M. Karr, Jr.,

and Vivian Karr are the only children and heirs of James M. Karr who died testate July 23, 1927. On November 5, 1915, he made his will which after his death was duly admitted to probate. When the will was made Mr. Karr owned 485 acres of land and an undisclosed amount of personal property. He is not shown to have been then indebted. By clause 3 of his will he disposed of the real estate he might own at his death. It reads as follows:

"I will and devise unto by said wife, Belle Karr, and my son, James Karr, and my daughter, Vivian Karr, for and during their natural lives, all of my real estate, wherever situated at the time of my decease; to have and to hold the same as life tenants in equal shares so long as they shall live, and at the death of any one of them, his or her share shall pass and descend to and vest in his or her lineal heirs or descendants, if she or he has any such descendant or descendants surviving, and if not, then to pass to and be owned by the remaining life tenants so long as they both live; and at the time of the next death among the said life tenants whatever share or shares he or she shall then have shall pass and descend to and vest in his or her lineal heirs or descendants, if he or she has any such descendant and descendants surviving, and if not, then to pass to and be owned by the remaining life tenant so long as he or she shall live; and at the death of the last survivor of said life tenants whatever share or shares he or she shall then have shall pass to and be owned by his or her lineal heirs or descendants; provided, however, that none of said life tenants, Belle Karr, James Karr, or Vivian Karr, shall have any right or power to sell, convey or mortgage said real estate, or his or her interest therein or part thereof, or to anticipate the rents or profits thereof for more than one year in advance, or to lease the same or any part thereof for any period of more than one year, provided that any lease may be for a term of one year from and after the first day of March next after the making of such lease; and any and all sales, conveyances, mortgages, or leases of said real estate, or interest therein, or of the rents or profits thereof for more than one year as above provided, shall be void and of no effect or validity whatever."

There is no other reference to real estate except in clause 4, where the testator provides that his personal property shall be reduced to money and after paying costs of administration and a $1,500 legacy to his wife, the money shall be loaned and the interest divided equally among his wife and said son and daughter "so that such interest and the use and rents and profits of my said real estate may serve them as means of support," with the further provision that such money should be equally divided among the three when Vivian reached the age of eighteen, or go to the survivor or survivors at her

death if she should die before reaching that age. When the will was written both children were minors, the son being about fifteen years old and the daughter about two.

On June 7, 1922, James M. Karr and his wife, by warranty deed reciting a consideration of $18,750, conveyed to their said son, James M. Karr, Jr., and to his wife as tenants by the entirety, 150 acres of the land Mr. Karr owned when he made his will. He died owning the remaining 285 acres and no other real estate so far as the record shows.

Shortly after Mr. Karr's death his widow became insane and the present plaintiff, Ella Graham, a sister, was appointed her guardian and curator. In that capacity Mrs. Graham for her insane ward renounced the will and elected to take a share of the real estate equal to that of a child. No question is raised as to the validity or effectiveness of such renunciation and election.

This action seeks adjudication of the title to and partition of the 285 acres of land owned by James M. Karr at his death. Plaintiff in her petition, after the necessary formal allegations, pleads the execution and probate of the will and the conveyance to the son, alleges that the latter in fact paid no consideration for the conveyance but that it was made by Mr. Karr and accepted by the son "in satisfaction, substitution and ademption of the bequest of one-third part of his estate," at the request of the son and pursuant to a parol agreement between father and son that it should be so made and accepted; wherefore the land in suit equitably belongs to the mother and daughter, one-half to each, and the son is entitled to no interest therein. The petition prays for judgment accordingly and for general relief.

The separate answer of Vivian Karr presents the same issue but goes farther. In addition to substantially the same allegations as in the petition it alleges that at the time of executing the will testator had a "large amount" of personal property; that the deed to respondent was accepted by him as satisfaction and ademption of his full share in the estate of testator; that (in substance) by reason of the conveyance to respondent and the renunciation of the will by plaintiff and her election to take a child's part absolutely, the will became inoperative, void as to respondent, and the whole scheme and intention of testator of equality of distribution among the beneficaries became impossible of performance and that, therefore, the whole will by reason of such changed conditions has bcome null and void as to the plaintiff and said defendant, Vivian; "that in right, equity and good conscience, and in consideration of all the facts and circumstances aforesaid and the intentions of the testator, James M. Karr, his bounty and estate, the said James M. Karr, Jr., has no

interest therein'' and that the plaintiff and appellant should be decreed to be the owners as tenants in common, one-half each, of said lands, to the exclusion of respondent. This answer concludes with a prayer that the court ''construe said will and protect the rights of said minor child therein,'' ascertain and determine the right, title and interests of the parties in the real estate sought to be partitioned, define and adjudge the ''title, estate and interest'' of the parties in all of the real estate owned by testator when he made the will, ascertain and decree ''the rights and interests and the debts and obligations of any and all parties due or owing to said estate,'' and that the land ''involved herein'' be partitioned between plaintiff and the appellant, and for general relief.

The answer of defendant James M. Karr, Jr., admitted, as the other parties had pleaded, that there was sufficient personal property to pay all debts; the relationship of the parties to the testator; pleaded the will; admitted the renunciation and election by the widow by reason whereof she was entitled to one-third of the lands sought to be partitioned in fee; alleged that the remaining two-thirds belonged to the two defendants as provided in the will; denied generally the allegations not admitted; and asked that the plaintiff's one-third be allotted to her in kind and the remainder allotted to the defendants to be held under the terms of the will.

Over the objections of respondent and ''subject to the objections,'' the court permitted the plaintiff and the appellant, respondent's codefendant, to introduce evidence designed to prove their contention as to the purpose and effect of the conveyance to respondent of June 7, 1922. Such evidence was in substance as follows:

Mrs. Graham testified that she had had a conversation with respondent shortly after his father's death in which something was said about his ''coming in for another third. I says: 'Jim, you certainly wouldn't do that, such a thing.' And he says: 'No, I have had my part, but I would like to have it fixed so I would know I would get my part of what is left of Mother's.' '' She testified that the day before Mr. Karr's death she had a conversation with respondent ''something to the same, that he thought he could come for another third if the will could be found;'' that he seemed to know there was a will, said there had been. ''Q. Did he say he was going to try to beat his mother and sister out of what was rightfully theirs? A. He said he could come in for another third he thought.'' She said further that on that day she had seen the will in Mrs. Karr's hands, did not read it; ''we didn't open it up;'' that it was found in an old trunk where Vivian suggested it might be.

Another witness, Mr. England, testified that in a conversation with respondent after his father's death the subject of the estate

and the will came up and respondent said "he felt he had gotten his part of the estate but he wanted his mother's part when she was done with it divided equally among he and his sister."

Vivian Karr testified that a few days before the deed to her brother was made she (then nine years old) heard a conversation "at home" between her father and her brother; that her brother said to her father "he needed some money and my father told him he didn't have the money or couldn't let him have the money at the time; he said: 'Well, if you will give me my part now I can get a loan on the land and I wouldn't have to have any; wouldn't have to ask you for any money.' " "Q. What was your father's reply to that? A. He said he would give him his land if he wouldn't ask him to go on any more notes for him."

She testified that a few days later her father and mother, brother and herself went to Kingston to the office of D. O. Love, Probate Judge, where the deed was drawn by Judge Love and executed by her father and mother; "there was some argument about the description of the land . . . didn't seem like they could get it divided the way they wanted to so it would be about a third of the land." On cross-examination she said she never heard any other conversation between her father and brother or in the family about the deed or on that subject, either before or after the deed was made; that at that time she knew her father "had a will," knew it about two years before (when she was seven) and she thought her brother knew it. The will seems not to have been mentioned in the conversation between father and son. The witness could not remember anything said by the parties in Judge Love's office. She testified she did not know where the will was when Mrs. Graham was at the house on the occasion when the latter testified to seeing it and had not aided in the search for it or suggested where it might be found.

Judge Love, who wrote the deed, did not remember Vivian's presence on that occasion. He recollected only Mr. and Mrs. Karr and Jim being at his office. He testified that Mr. Karr pointed out on an atlas the land to be conveyed and so far as he could recall there was no argument or discussion about the land to be included and no difficulty in "working out" the description, there "wasn't any question about it" nor was there any conversation between the parties that he could recall at the time of the execution or delivery of the deed.

It was also shown that at the time the deed was made Mr. Karr was obligated as surety for his son on notes aggregating about $3,800; that the son had built a house on the land included in the deed against which a mechanic's lien had been filed, the amount of which

is not disclosed, and that after receiving the deed respondent had procured a loan on the land and had paid those debts.

Respondent, testifying in his own behalf, without objection, gave a version of the conversations with Mrs. Graham differing from hers. He said that in one conversation "she asked me what I was going to do about it, if I was going to concede my third in the will or if I thought that would be the thing to do. I told her I was going to abide by the will." In another conversation he testified: "I said I would have a hundred and fifty acres more land according to the will; that if the will give us an equal share I would have a hundred and fifty acres more land than Vivian." He testified that the foregoing was all he had said to Mrs. Graham on the subject. He denied telling Mr. England that he felt he had received his part of the estate.

On cross-examination by appellant's counsel and over respondent's objection, the following was developed: That at the time the deed was made he owed the notes above referred to on which his father was security and the debt represented by the mechanic's lien; that he had built the house and moved into it with his father's permission; that after the deed was made he procured a loan of $7,000 on the land and out of that paid said debts; that he paid nothing for the land. There is mention of a second loan of $7,000 but it does not appear whether that was in addition to or for the purpose of satisfying the first. Asked why his father made him the deed (still over his objections) he said he had tried to get insurance on the house which had been refused because he did not own the land and when he so informed his father the latter said he ought to have insurance; that a day or so later he again talked with his father about the insurance, did not remember who brought up the subject, and his father said "he had thought about deeding me some land down there," didn't know that his father said much more, and "I told him it would be all right with me;" that nothing was said about debts or about not asking his father to sign more notes; that a few days later his father and mother and himself went to town, his sister not accompanying them, and not being present at Judge Love's office, and the deed was executed; that his father had subsequently, at his request, signed more notes as security for him. He was asked, over his objections, about notes of his signed also by his father which had been presented and allowed against the estate and admitted that there were such notes aggregating about $2,200. It is not clear whether or not these were the notes given after the execution of the deed. He further testified that there was no argument at Judge Love's office about the description of the land to be conveyed; that his father gave Judge Love the description; "we figured it out on the atlas;" there

was no discussion, "just locating the land was all." At the conclusion of the evidence the court announced:

"At the conclusion of all the testimony the court sustains the objections of attorneys for defendant James M. Karr, Jr., as to all testimony tending to prove a contract between James M. Karr, and his son, James M. Karr, Jr., which was objected to at the time and all testimony tending to vary the terms of the will or deed introduced is by the Court held to be incompetent and is not considered by the Court in making his finding and judgment herein, and all motions to strike out such testimony which was admitted subject to objections are by the Court sustained and said testimony is stricken from the record."

Appellant assigns as error: (1) That the court struck out and refused to consider the testimony "relating to the contract" between James M. Karr and respondent pursuant to which it is claimed the former conveyed and the latter accepted the 150 acres "in satisfaction, substitution, ademption, extinguishment and discharge of the legacy previously made to him in the will of the said James M. Karr;" (2) that the court refused to construe the will "in the light of the testimony," as prayed by appellant; and (3) that the court erred "in determining the interests of the parties in and to the property of which the said James M. Karr died seized."

■ Appellant seeks to apply in this case the doctrine of ademption applicable to legacies. That doctrine applies only to bequests of personal property. It does not apply to devises of real estate. [Fisher v. Keithly, 142 Mo. 244, 43 S. W. 650; Burnham v. Comfort, 108 N. Y. 539; Allen v. Allen, 13 S. C. 512, 36 Am. Rep. 716; Arthur v. Arthur, 10 Barb. (N. Y.) 9; Weston v. Johnson, 48 Ind. 1; Marshall et al. v. Rench et al., 3 Del. Ch. Rep. 239, 255-6; 40 Cyc. p. 1914, sec. D2.]

In Fisher v. Keithley, supra, the testator, owning 300 acres of land, devised 100 acres to a son, giving the remainder to his other children. Some five years later he conveyed 150 acres to the son, which land did not include the land devised. He died without revoking or altering the will. The son claimed the devise as well as the land conveyed by the deed. The evidence tended strongly to prove, was very convincing, the court said, "that the testator intended that the provision made by the deed should operate as a revocation of the devise, or rather, he believed that the devisee had forfeited the testamentary provision by reason of leaving home and ceasing to care for him." The court stated that both instruments were valid and proceeded to determine whether or not the conveyance "revoked, adeemed or satisfied" the provision made for said devisee in the will, "assuming, as the evidence tends to prove, that the testator intended

it to have that effect," and held that it did not and that the son was entitled to hold the land conveyed to him and also to take that devised, though it gave him the bulk of the estate, apparently contrary to the testator's intent. The doctrine of ademption and the principles upon which it is based are discussed and the fact pointed out that with the exception of but one case by a divided court the doctrine had never been held applicable to devises of real estate; that "while no reason, on principles of justice and equity, seems to exist for the distinction made between a bequest of personal property and a devise of real estate, yet the distinction has ever been most uniformly made by the courts, not because the equities are not the same, but because of the safeguards that have ever been thrown around the transfers of real estate and contracts by which titles are affected." The court further said that the rule has remained unchanged by legislation though questions of the revocation of wills and of advancements have been dealt with and "we must assume that no change has been considered desirable. We do not think the courts at this day should take the initiative in abrogating a rule which has been so long and so universally approved." █ The court also called attention to the statute (now Sec. 520, R. S. 1929, Mo. Stat. Ann., sec. 520) providing that:

"No will in writing, except in the cases hereinafter mentioned, nor any part thereof, shall be revoked, except by a subsequent will, in writing, or by burning, canceling, tearing or obliterating the same, by the testator, or in his presence, and by his consent and direction."

The exceptions referred to in the statute have no application in the instant case nor had they in the Fisher case. See, also, Wickliffe v. Wickliffe, 206 Mo. App. 47, 226 S. W. 1035, for discussion of the doctrine of ademption.

This question was thoroughly considered and the same conclusion announced as in the Fisher case in 'Burnham v. Comfort and Allen v. Allen, supra, both of which are cited with approval in Fisher v. Keithley. In those cases, as in the Fisher case, the devise was of specific real estate. In Marshall et al. v. Rench et al., supra, another carefully considered case, the testator in his will directed that his estate, real and personal, should be divided equally among eight of his children, to some in fee, the shares of others being settled in trust, with the further provision that upon the death of any without child or children the share of the one so dying should go to the surviving children of testator. When the will was made the testator owned twenty-five parcels of real estate. Thereafter he conveyed several parcels to several of his children. It was contended that those conveyances were intended by him as advancements towards the distributive shares of the respective grantees and should be considered

in making partition and distribution of the remaining lands owned by testator at his death. The court denied the contention. Answering the argument that, though not within the statute as advancements, the conveyances might be held to operate as a satisfaction of the undivided interests devised to the grantees, by analogy to the doctrine of ademption applied to legacies, the court said:

"In the present case had the testator made, by the will, a partition of his lands, devising a specific parcel to each child, and had afterwards conveyed to some of the children the tracts to them in severalty, then the conveyances would have been a part execution of the will, and like the ademption of a legacy, by a subsequent settlement of a *portion on the legatee.* But here the conveyances cannot be legally held to be of the same lands which were devised to the grantees. The will speaks from the death of the testator, and devises to the grantees a share of such lands as the testator *should die* seized of, i. e., the remaining lands other than those conveyed. In no legal sense can a conveyance of specific tracts in severalty be deemed a satisfaction or execution of a devise of other lands, or of an undivided share of the remaining lands." [3 Del. Ch. Rep. 255.]

The court further held that the conveyances could not operate as a revocation of the devises to the grantees in whole or in part, because the will could be revoked only in the manner prescribed by statute, except in case of implied revocation in certain circumstances not there, or here, existing, stating:

"The conveyance to a devisee of lands, other than those devised, or of an interest in lands different from that devised, has never been held an implied revocation of the devise."

If the devise in this case had been of specific land and afterwards the testator had conveyed the same land or part thereof, such conveyance would have operated as a revocation of the devise wholly or *pro tanto,* as the case might be. But, as said in Fisher v. Keithley, supra, 142 Mo. l. c. 252, 43 S. W. 650:

"This results from necessity, on account of a failure of the subject of the devise. It cannot be regarded either as ademption or as exception to the statutory mode of revocation."

See also Dunlap et al. v. Hart et al., 274 Mo. 600, 204 S. W. 525, 3 A. L. R. 1492, holding that while a subsequent sale by the testator of specifically devised land will operate to defeat the devise, the proceeds of the sale or other land purchased therewith will not be substituted under the will for the devise, citing Cozzens v. Jamison, 12 Mo. App. 452.

The devise here was not of specific land but of an undivided interest in the property of which testator should die seized. The devise remained unrevoked by any method provided by statute and

there remained at testator's death a substantial estate for the will to operate upon. There could therefore have been neither an ademption nor revocation of the devise. Neither can the doctrine of advancement apply. There was no intestacy. The testator by his will disposed of the whole estate he might leave, mentioning and providing for all of his descendants. [Turpin v. Turpin, 88 Mo. 337; Secs. 311, 525, 526, R. S. 1929, Mo. Stat. Ann., secs. 311, 525, 526.]

■ Appellant stresses the alleged contract or agreement between testator and his son that the conveyance should be accepted by the latter in substitution for and satisfaction of the devise. In Burnham v. Comfort, supra, the testator, after making his will, in which he devised certain real estate to his daughter, gave the daughter a sum of money and took from her a writing in which she acknowledged receipt. of the money "as my part of my father's estate up to this time, and all such other property as he may accumulate up to his decease." It was conceded that such payment by the testator to the daughter was at the time intended by him and accepted by her in lieu of the devise to her in the will. But the court refused to give it effect, holding that to do so would amount to a revocation of the will contrary to the statute, and further that the writing was not binding upon the testator since his will was inoperative until his death and did not inure to the benefit of the appellant (another heir). Pertinent to the facts in this case the court said:

"Appellant was no party to it (the writing), and no consideration moved from him for its execution. The question is not such as would arise by reason of a transaction between the respondent, as the legatee, and appellant, as the residuary legatee, by which she had transferred or released to him her interest under her father's will in due form. After the writing had been delivered the daughter may have been precluded from asserting her right to recognition in her father's will, but the father was at liberty either to give legal effect to the transaction by changing his will and revoking the provisions in his daughter's favor or to reconsider any previously existing intention of altering his provision for her. Although he survived the transaction fifteen years, he did not change his will, and the presumption of a subsequent change of intention, on his part, from any motive, may be entertained without doing any violence to our ideas of strict justice." [108 N. Y. l. c. 539.]

In Allen v. Allen, supra, the testator in his will made specific devises of land to two daughters and later gave each money and took from each a writing in which, in consideration of the money, she relinquished her interest in the land. It was held that the writings were nullities, leaving the devises unaffected by those transactions.

The court said that the doctrine of ademption has never been applied to devises of real estate and, further:

"  .  .  .  we do not feel justified in disregarding the well-established line which has for ages been drawn between real and personal estate, even though we may be thereby compelled to thwart the obvious intention of the testator and disturb that distribution of his property which he thought was proper and just to his descendants.  For while the intention of the testator is the cardinal rule of construction of a will, yet such intention cannot be given effect where it is in conflict with the rules of law.  A devise of real estate cannot, like a pecuniary legacy, be affected by any subsequent transactions between the testator and the devisee, but must stand until it is revoked or altered in the manner prescribed by law.  The papers signed by Mrs. Watson and Mrs. McCalla cannot, therefore, operate, as they were doubtless intended, as ademptions of the devises to these ladies."  [13 S. C. 1. c. 527.]

The court also said the conveyance could not be treated as advancements, the doctrine of advancements applying only in cases in intestacy, and that to give the transactions evidenced by the writings the effect of advancements "would, in effect, be an alteration of the will without the formalities required by law for such a purpose," and further, that there was no consideration for the releases as between those who signed them and the other heirs, and "it could not be said that there was any valuable consideration passing between the testator himself and those who undertook to release, for the testator having, up to the time of his death, absolute testamentary power over all his property, could, by a simple stroke of his pen, have effected the very same objects by revoking any legacy or devise in his will."

In the light of the foregoing authorities it would seem that the evidence stricken out by the court was properly rejected.  There was no agreement between respondent and other beneficiaries in the will by which he purported to release to them his prospective interest in the estate, nor consideration for such agreement.  If there was an agreement with the testator, as claimed, it was not binding on the latter, was without a valuable consideration, did not preclude the testator from changing his mind if he did then intend that the son should receive nothing more from him, and he did not carry it out by altering his will as he could easily have done.

█  Even were we to hold, as is intimated in Marshall et al. v. Rench et al., supra, might be done, that on principles of equity such an agreement might be enforced by obliging the son at testator's death to release any share of the remaining estate, the evidence does not justify a finding that there was such agreement.  The evidence on

that issue, though disregarded and ordered stricken out by the trial court, is in the record. The case has been throughout treated by the parties and was tried by the court below as an action in equity. We so treat it. We may therefore consider that evidence. [Webb v. Salisbury, 327 Mo. 1123, 39 S. W. (2d) 1045, and cases.]

If an agreement such as that here asserted can, in any event, be given the effect here claimed the evidence should at least be clear and convincing that the alleged agreement was made as claimed. The only testimony of an agreement was that of appellant who was a child nine years of age when she claims to have heard it, that the respondent requested his father to give him his part then so that he would not have to ask his father "for any money" or to sign notes for him and that the father said "he would give him this land *if he wouldn't ask him to go on any more notes for him.*" No mention was made of the will either then or when the deed was prepared and executed. It is by no means clear that respondent then knew the will had been made. The statements attributed to respondent to the effect that he felt he had received his share of the estate are as easily referable to a feeling on his part that, having received by way of gift as much as would remain for his sister if he took no more, he therefore ought not in fairness take more, as they are to a contract or agreement precluding him from so doing. Indeed, in one of the conversations testified to by appellant's witness, Mrs. Graham, respondent expressed the belief that he was entitled to take under the will. The deed from testator to his son was an absolute and unconditional conveyance. It makes no reference to the will nor does it contain any intimation that the land conveyed was intended as the grantee's portion of his father's estate. Although he lived five years after making the conveyance the testator did not revoke or alter the will. The evidence offered, if appellant be given full benefit of it, is clearly insufficient to establish the alleged agreement relied upon.

■ Appellant invokes the rule that the testator's environment and circumstances at the time of making his will may be looked to in determining the intent sought to be expressed therein. Where there is ambiguity in the language of the will extrinsic facts are admissible to aid in determining the intent sought to be expressed but only for the purpose of ascertaining testator's intention from the language he used in the will. "It cannot be heard to show that he meant one thing when he said another or to show an intention not expressed in the will itself, or to aid in making a will which the testator intended to make, but did not in fact make." [McCoy v. Bradbury, 290 Mo. 650, 658, 235 S. W. 1047, 1049.]

■ In this case the testator's intention at the time he made his will to treat his children alike in the distribution of such estate as he

might leave is clearly enough expressed in the will without extrinsic aids to interpretation. Appellant's trouble is, not that testator's intention when he made the will is not clearly expressed, but that he appears to have changed that intent thereafter. The rule referred to can perform but a negligible office, if any, when invoked to illuminate a condition arising *dehors* the words of the will and long after it was written. Dunlap et al. v. Hart et al., supra. We do not think the presumption can be indulged that Mr. Karr, when he made the deed to his son, intended that his children should receive equal portions from him. If he did then have such intention he could easily have expressed it in the deed or by alteration of his will. [See Wickliffe v. Wickliffe, supra.]

In Philbert v. Campbell, 317 Mo. 556, 296 S. W. 1001, 1003, the rule is stated that a will must be construed and the testator's intention as expressed therein determined in the light of the statutes "existing at the time of the making of the will and the death of the testator, for the testator must be presumed to have had knowledge of the existing statutory law, and to have made his will in the light of, and subject to, the existing statutory law." Part of the existing statutory law when this will was made and continuously thereafter was that providing how, alone, the will might be revoked. The testator must be presumed to have known and doubtless he did know that. The courts cannot make a new will for him or revoke part of the one he made nor can they distribute his property contrary to his legally expressed will in order to accomplish equality and what may seem to the court equity between his children. We think the circuit court reached the correct result and its judgment is affirmed. *Westhues* and *Fitzsimmons, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.