FRANK ADEN, RENA ADEN, J. W. KEARBEY and BLONDE KEARBEY v. G. W. DALTON, JOHN R. BOYDEN, and BANK OF POPLAR BLUFF, Appellants.—107 S. W. (2d) 1070.

Division One, July 30, 1937.

*Abington & Freer, Phillips & Phillips* and *Lawrence E. Tedrick* for appellants.

*David W. Hill* and *Orville Zimmerman* for respondents.

BRADLEY, C.—The Adens and Kearbeys filed separate suits to cancel mining leases. The two leases involved, and the pertinent facts, are practically identical, except as to names and description. The causes were consolidated below and tried as one and a single judgment entered, canceling both leases. From this judgment defendants appealed. Hereinafter, the term defendants has reference to defendants Dalton and Boyden.

The Aden lease covers forty acres in Butler County, Missouri, and was executed October 27, 1920. Plaintiffs, Frank Aden and his wife, Rena, are lessors of this lease and G. Earl Doane and defendant Dalton, are the lessees, but later, defendants became the sole owners. The Kearbey lease covers eighty acres in Butler County, and was executed March 15, 1921. Plaintiffs, J. W. Kearbey and his wife, Blonde, are the lessors in the Kearbey lease; defendants and G. Earl Doane and D. H. Doane are the lessees, but defendants later became the sole owners of the Kearbey lease. The primary purpose of both leases was prospecting for and the mining of a valuable clay, if found in paying quantities, but the leases included all kinds of mineral and mineral products. The consideration in each lease was one dollar, receipt of which was acknowledged, and "the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed." Each lease was for a term of five years from and after the date thereof "and as much longer thereafter as mineral or mineral products, or either of them, are found on the property covered by this lease or block of leases" in Butler County, Missouri. The land cov-

ered by the Aden lease was a part of ''a block of land or leases'' in a five-mile radius from the Good Hope School House, and the Kearbey lease was a part of ''a block of land or leases'' in a five-mile radius from the Rushville School House. Each lease provided that ''the lessee in coming to this district for the purpose of developing it, will manifestly find it impossible to actually mine, drill or operate each tract of land within the district; therefore, for the period of five years, the lessor hereby agrees that if said lessee is actually operating within or on any of the land'' within the radius, then the lessee ''is, from the standpoint of making this lease valid, actually working the land described.''

The lessees were to pay lessors ten per cent ''of all money derived from the sale of any and all mineral and mineral products.'' Each lease provided that if no mining or mining operation was commenced in 90 days ''this lease shall terminate . . . . unless the lessee on or before that date pay or tender to the lessor, or to the lessor's credit in the Bank of Poplar Bluff . . . the sum of twenty-five cents per acre, which sum shall operate as a rental and cover the privilege of deferring the commencement of mining or mining operations for twelve months from this date, and shall continue this lease in full force and effect for the said period of time. In like manner and upon like payments or tenders of payment the commencement of mining or mining operations may be further deferred for like period of the same number of months successively, and this lease will be thereby extended for such periods of time. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privileges granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending the period as aforesaid and any and all rights conferred.''

It is alleged that the leases are void in that they are unilateral, perpetual and without consideration; that no rental has been paid, tendered or deposited; that the leases are vague, uncertain, indefinite and involved; that they are ''construed by the lessees'' as perpetual, ''while the lessors, when they executed the same, understood they were terminable . . . hence there was no meeting of the minds of the lessors and the lessees at the time of the execution'' of the leases. It is further alleged that the lessees and those claiming under them have abandoned ''the above described premises and have carried on no mining or mining operations'' on the Aden lease since November 28, 1930, and on the Kearbey lease since January 1, 1931; that by such abandonment the lessees and those claiming under them ''have forfeited all the rights that they or either of them had, if any, under'' the leases; that written notice declaring forfeiture was served by the lessors.

Defendants answered by general denial, and further alleged that

they "have carried out all the terms of said leases devolving upon them to be kept and performed, and have paid plaintiffs all the amounts due them under said leases." Defendants sought to file an amended answer and were refused permission, but they made no complaint on this in the motion for a new trial.

In rendering judgment the court found that "the allegations in both petitions of plaintiffs are true; that the leases described in both petitions are null and void and should be canceled, set aside and for naught held, for the principal reason that neither of the leases obligates the lessees, or those holding under them, to do or refrain from doing anything."

There is no claim that "mining operations" were not commenced in ninety days. Mining work was started on the Aden lease "shortly after the execution of the lease," and on the Kearbey lease "early in 1921." Operations were continued for about a year, and then the Missouri Clay Mining Company was incorporated, and defendants assigned these leases to the mining company. Defendants owned thirty-seven and one-half per cent each of the stock in the mining company and the Doanes owned the remaining twenty-five per cent. After the organization of the mining company, operation was carried on by the owners of this company until December 1, 1928, when defendants sold their stock to C. L. Gray. The mining company owned leases, including the ones here involved, covering 4040 acres (the two blocks as we understand), and when defendants sold their stock to Gray they took back a deed of trust for $20,000, executed by the mining company, to secure the purchase price notes given, which notes included four principal notes for $4000 each, due from one to five years and ten interest notes aggregating $3600. According to plaintiffs, no actual mining, that is, work *in* the mine, was done on the Aden lease after November 28, 1928, and none on the Kearbey lease after January 3, 1931. After Gray bought the stock of defendants in the mining company, that company was under the control of Gray. While under his control the mining company became involved and a receiver was appointed by the Circuit Court of St. Louis, and finally, on June 27, 1932, a petition in involuntary bankruptcy was filed against the mining company, and it was adjudged a bankrupt on October 13, 1932. The purchase price notes given to defendants for their stock in the mining company were not paid as they became due, and they endeavored to foreclose, but foreclosure was never completed. Sometimes Gray would make a payment and foreclosure would be abandoned, and on one occasion, defendants were cited for contempt by the Circuit Court of St. Louis, because of their activities to foreclose, contrary to a restraining order made by the St. Louis Circuit Court. July 20, 1933, defendants, at public sale by the trustee of the bankrupt estate of the mining company, purchased the Aden and Kearbey

leases, and also the other leases in the two blocks. Defendants' bid was $10, and the trustee's deed recites that it was subject to "mortgage indebtedness of record," which had reference to the deed of trust held by defendants.

As stated, according to plaintiffs, no actual mining was done on the Aden lease after November 28, 1930, and none on the Kearbey lease after January 3, 1931. It also appears that no *rental* was paid to plaintiffs or deposited to their credit in the Bank of Poplar Bluff or elsewhere in order to defer *commencement* of mining operations. Defendants' evidence is that the value of the clay on these two leases, at the time of the trial, was $50,000. It was estimated by a mining engineer that on the Aden lease there were 850,000 tons of this clay worth $40,000 as it lay, and that on the Kearbey lease there were 125,000 to 150,000 tons of the value of $10,000. Defendants made an offering, the evidence being excluded on objection, to the effect that they had expended $150,000 in the development "of these two mines," one each on the leases in question. It also appears that the Kearbeys were paid about $5000 royalties on the clay mined from their land, and the Adens were paid royalties amounting to about $200.

Are the leases unilateral? As appears, supra, the learned trial chancellor held the leases void "for the principal reason that neither of these leases obligates the lessees, or those holding under them, to do or refrain from doing anything." "A unilateral contract is one in which no promisor receives a promise as a consideration for his promise. A bilateral contract is one in which there are mutual promises between two parties to the contract; each party being both a promisor and a promisee." [American Law Institute's Restatement of the Law of Contracts, sec. 13; 13 C. J., p. 331, sec. 179.] "Mutuality of contract means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." [Gillen v. Bayfield, 329 Mo. 681, 46 S. W. (2d) 571, 1. c. 575.]

The leases here involved were signed by both the lessors and lessees, and are free from the situation that existed in Reid v. Gees et al., 277 Mo. 556, 210 S. W. 878, where it was held that a lease signed by the lessor alone creates an estate at will, and is void as a lease for a term of years. The lease in Hecht v. Repetto (Mo. App.), 33 S. W. (2d) 1021, was a clay mine lease. The lessors for the consideration of one dollar, receipt of which was acknowledged, "and for the further consideration and agreement" thereinafter stated, leased the premises to the lessees "for the full term of twelve months . . . and as much longer as clays (naming them) are found in paying quantities." The lessees agreed "to pay the lessors a royalty of 15 cents" per ton for No. 1 white, and 25 cents per ton for No. 1 rough, and agreed to

make settlement for royalty "on or before the 30th of each month." The lessees agreed "to keep a complete record of the entire output," and "to carry on the work of mining in accordance with customary methods. . . . Unless an unavoidable cause prevents." It was held that the lease was not unilateral.

If it be conceded that the leases at bar were in the beginning unilateral, that does not mean that they *always* remain so. The record shows that the lessees and their assigns developed, at great expense, a clay mine on each of these leases and that actual mining operations were carried on somewhat extensively. A "lessor cannot, after permitting entry for explorations, declare a forfeiture or procure a cancellation of the lease upon the grounds that the lease was without consideration and void for want of mutuality." [Archer's Law & Practice in Oil and Gas Cases, p. 344; Eclipse Oil Co. v. South Penn Oil Co. (W. Va.), 34 S. E. 923; Lowther Oil Co. v. Miller-Sibley Co. (W. Va.), 44 S. E. 433; Henne v. South Penn Oil Co. (W. Va.), 43 S. E. 147; Rich v. Doneghey (Okla.), 177 Pac. 86; Hopkins v. Zeigler (C. C. A.), 259 Fed. 43, 1. c. 46, and cases there cited; Ulrey v. Poe, 134 Ill. App. 298; Von Hatzfeld v. Haubert (Tex. Civ. App.), 224 S. W. 220; 40 C. J. 1049-50.]

In Morrison & DeSoto's Oil & Gas Rights, page 73, it is stated: "It may be stated in general that attacks on oil leases for want of either consideration, or of mutuality, have usually failed—except on bills for specific performance, where both mutuality and consideration seem to be required. And why should they not fail? Both parties on the surface contract or attempt to contract about value supposed to exist a thousand feet under the spot where they stand. The one who undertakes to demonstrate this value takes all the risk and it is unconscionable to say that he shall be denied the realization of his anticipations for nonconformity to an abstract proposition upon which so many different opinions have been delivered in the attempt to apply it to the ever varying complications of oil and gas contracts."

So far as appears, no complaint came from the Adens about the invalidity of their lease until July 26, 1932, when they served written notice to terminate the lease "before the 27th day of October, 1932." The Kearbeys served notice, January 28, 1931, "to vacate and deliver to us the immediate possession." The suits to cancel were not filed until February 17, 1934. For the most part, from the execution of the leases down to the date of the trial, the lessees and their assigns were engaged in actual mining or marketing, or endeavoring to find markets. It appears that the one dollar named as one of the considerations was not actually paid, but under the present record such failure was wholly immaterial. "If the lease shows only a nominal cash payment, it is presumed that the principal consideration, particularly in undeveloped territory, is the prospecting and developing of the

land for oil and gas; and where promises or agreements to this effect are made, the fact that the nominal consideration is not paid is immaterial." [40 C. J., p. 1049, sec. 633. See, also Tetley v. McElmurry 201 Mo. 382, 100 S. W. 37; 13 C. J., p. 614, sec. 664.] But Corpus Juris (40 C. J., p. 1050) in the same connection goes on to say that "where the cash consideration is not in fact paid and no well is drilled, the lease is unilateral and subject to cancellation." However, the last-mentioned situation does not obtain in the present case.

It is our conclusion that the lease, under the facts as to performance on the part of the lessees, are not unilateral or lack mutuality or that there is want of consideration. All these in mining leases frequently are blended, but we do not deem it necessary to enter upon an academic discussion. For such discussion, see Rich v. Doneghey (Okla.), 177 Pac. 86, 1. c. 90 et seq.

■ Plaintiffs also contend that the leases are void because not limited as to term. As appears above, the leases were for a term of five years "and as much longer thereafter as mineral or mineral products or either of them are found on the property covered by this lease or block of leases. . . ." The phrase "in paying quantities," which usually appears after the word *found* in similar paragraphs of mining leases is omitted from the present leases. Similar language as to the duration of mining leases (except as to the omitted phrase), as appears in the present leases, is common in mining leases, and have not been held to affect the validity of such leases. Of such *extending clauses* in oil and gas leases, Mills & Willingham's Law of Gas & Oil, page 118 says: "The finding or producing of oil or gas during the fixed term, in accordance with the provision of the lease, is a condition precedent to the right to hold or produce from the land after the expiration of the term. Such finding or producing of oil or gas during the fixed term, however, extends the lease after the expiration of the fixed term as long as that condition shall continue." Many cases, supporting the text quoted, are cited, among which are South Penn Oil Co. v. Snodgrass (W. Va.), 76 S. E. 961, 43 L. R. A. (N. S.) 848; Young v. Forest Hill Oil Co. (Pa.), 45 Atl. 121; Barbour-Stedman & Co. v. Tompkins (W. Va.), 93 S. E. 1038, L. R. A. 1918B, 365; Gillespie v. Ohio Oil Co., 260 Ill. 169, 102 N. E. 1043; Texas-Pacific Coal & Oil Co. v. Bratton (Tex. Civ. App.), 239 S. W. 688; Enfield v. Woods (Ky.), 248 S. W. 842; Parks v. Sinai Oil Co. (Okla.), 201 Pac. 517. See, also, Hecht v. Repetto (Mo. App.), 33 S. W. (2d) 1021. We hold that the *extending clause* did not make these leases void or authorize cancellation.

■ Plaintiffs say that the leases have been *forfeited* because of the failure to tender, pay or deposit the twenty-five cents per acre. We do not think there is merit in this contention. As appears, supra, the twenty-five cents rental per acre was to "cover the privilege of

*deferring the commencement* of mining or mining operations'' (italics ours) beyond the ninety days specified. And, as we have stated, there is no claim that "mining or mining operations" were not *commenced* within the ninety days.

 Were the leases abandoned? G. Earl Doane, a mining engineer with an experience of thirty years, testified that the clay mined from these leases is used principally in the manufacture of "semivitreous dinner ware, sanitary ware, floor and wall hard tile, decorated tiles and electric porcelains . . . special refractories and high tension insulators, . . . and extremely large insulators put in transformers, and . . . as grinders in the manufacture of grinding wheels;'" that this clay "is combined with other materials," and it is difficult "to get a manufacturer to make a change in the formula he is using, to change that formula in any respect by adding in another clay or to take something or other from it, or to in anyway vary his formula;" that manufacturers would not take this clay "if you would give it to them free and pay the freight on it besides, to their plant, unless they have gone through a long period of experiment and found it to be acceptable to their formula;" that there was "no market for this clay;" that "you have to show" the manufacturers "that this particular clay will fit into their formula;" that a market "for this clay is first built up by inducing a concern to believe you have enough, or that you have a sufficient deposit of clay in the first place. If you just have a very small deposit of clay, one that couldn't produce for a long period of time, they won't consider taking your formula into theirs. You first have to convince them that you have a large body or deposit of this clay.'" Doane further testified that in order to interest manufacturers in this clay that they had to be convinced that the deposits were sufficiently large and that the producer was "financially able and equipped to produce this clay uniformly, with additional cash to select and handle the clay as it is dug, and financially able to produce the clay for a long period of time," and it appears from the evidence of defendants that they measured up to the financial requirements.

It further appears from the evidence of Doane that many samples of this clay were sent to manufacturers over the country; that such has "always gone on and still is. My associates and I are still trying to sell this clay. Our eastern representative, Mr. Lee E. Ives, who lives at Cleveland, Ohio, is now in the employ of my associates and I at this time (trial—May 19, 1934) for the purpose of selling this clay. Then besides him, we have Mr. Charles M. Frozheim at Wheeling, West Virginia, who is a technical man and has charge of the experimental work. He is employed now in an attempt to market this clay. He and Mr. Ives represent us in the clay market territory. Mr. Frozheim is doing business as Charles M. Frozheim Company at

Wheeling, West Virginia. These two gentlemen represent our full sales force. Mr. Ives started working for us in that capacity about the first of the year, and Mr. Frozheim just recently, about a month ago."

Doane testified that the depression affected the sale of this clay; that all of the manufacturing plants "that were customers of this clay have been closed down, either entirely closed down or in a large part. Some of them have been running about a fourth of the time. I should say this industry was one of the first industries to feel the depression. That started in the fall of '29. . . . ".

Defendants make no claim that *actual* mining, that is, work in the mine, was done on the Aden lease after November 28, 1930, and on the Kearbey lease after January 3, 1931, but their evidence shows, and there is nothing to the contrary, that while "physical operation of the mines was not going on after these dates, yet a lot of sampling and selling of clay (already mined and stored) was going on."

The record shows that mining work of one kind and another was performed in connection with these leases, and under the management of defendants, from shortly after the execution of the leases until defendants sold their stock in the mining company to Gray in December, 1928. After that time and until the market established for this clay was destroyed by the depression in 1929, Gray carried on work in connection with the mines until the mining company, which he controlled, became involved in receivership and bankruptcy. When actual mining was going on, it was not at all times on either of these leases, but some times it was in a mine in what may be termed the Kearbey block, and this mine was a continuation of the *drift* from the clay on the Kearbey land. And it appears, as stated, that during receivership and bankruptcy of the mining company, practically constant effort was made to find a market, at least, for the clay already mined, and some was marketed during those periods. And, as stated, defendants, from the time default was made, in the payment of the purchase price notes for the sale of their stock in the mining company to Gray, vigorously endeavored, but without success, to foreclose their deed of trust. Also, it appears that Gray vigorously resisted this foreclosure, and when he was unable to be effective with *promises* and *persuasion*, receivership followed and a citation to defendants for contempt. The receivership was at the instance of Gray and, as we understand, its primary purpose was to prevent foreclosure by defendants. It cannot be said that defendants were *not interested* in the leases after the sale of their stock in the mining company to Gray. They were vitally concerned. All they had to show for their stock was the purchase price notes, executed by the mining company, which notes were secured by the deed of trust on the leases in the two zones. The trial chancellor did not in terms find that the leases had been *abandoned*, but plaintiffs so alleged in

their respective petitions, and the court found that "the allegations in both petitions of plaintiffs are true."

It is apparent that the *interest* of the lessees in the leases here is not a corporeal or incorporeal interest in the mining *estate* in the land. If it were such then it could only be released or conveyed by an instrument in writing or by limitations. But where a royalty is reserved from production, "it is manifest that the parties intended to embark upon a mining enterprise, and the right to explore the premises was granted as an incident thereto. The courts have, therefore, held that a grant of the land in an instrument that creates a lease, as distinguished from a mineral deed, is incidental to the consummation of the purpose of the parties, viz., the exploration and discovery of oil or gas in paying quantities, and the development of the premises to their mutual profit." [Mills & Willingham's Law of Oil & Gas, p. 166.]

This text on the same page further says: "The question whether, in any case, the lease has been abandoned, depends upon the intent of the lessee. But this intent is to be determined by his attitude towards the enterprise as a whole. He might intend to hold the land itself, without any intention of proceeding to test the premises for oil and gas; but having abandoned the purpose of the lease, he will be held to have abandoned the land which was granted as an incident of the enterprise. The question of abandonment, like any other question, is to be determined by all the facts and circumstances surrounding each particular case." Supporting the text quoted, the following, among other cases, are cited: Watford Oil & Gas Co. v. Shipman, 233 Ill. 9, 84 N. E. 53, 122 Am. St. Rep. 144; Manhattan Oil Co. v. Carrell, 164 Ind. 526, 73 N. E. 1084; Collins v. Mt. Pleasant Oil, etc., Co., 85 Kan. 483, 118 Pac. 54, 38 L. R. A. (N. S.) 134; United Mining Co. v. Norton, 174 Ky. 366, 192 S. W. 79; Gray v. Spring, 129 La. 345, 56 So. 305, Ann. Cas. 1913B, 372; Detlor v. Holland, 57 Ohio St. 492, 49 N. E. 690, 40 L. R. A. 266; Highfield Co. v. Kirk, 248 Pa. 19, 93 Atl. 815; Grubb v. McAfee, 109 Tex. 527, 212 S. W. 464; Laing v. Price, 75 W. Va. 192, 83 S. E. 497.

Archer's Law & Practice in Oil & Gas Cases, page 547, says: "Where a lessee enters upon the leased premises and discovers oil or gas in paying quantities his right to produce the oil and gas becomes a vested right, and before such right can be divested it must be proven that he intentionally abandoned the premises, and has relinquished possession thereof. The abandonment must be intentional, and the relinquishment actual. These are questions of fact, and it devolves upon the party asserting such abandonment to prove such facts."

It appears that when Gray took charge of these leases he commenced mining on what is called the company land, that is, in the *drift* that was continuous from the Kearbey land, when mining might then

have been conducted on the Kearbey land and possibly on either lease. And witness Doane said that the fact that Gray "wouldn't have to pay any royalty" on clay removed from the company land "probably was one of the reasons" for his commencing on the company land. Plaintiffs' invoke this action of Gray as evidence of abandonment. If it be so conceded, it is by no means conclusive.

This cause is in equity and we try it *de novo* and reach our own conclusion. In doing this in any equity case we should and do give due deference to the finding and judgment of the trial chancellor. ·The burden to establish abandonment was on plaintiffs, and we are constrained to rule that this record does not, in our opinion, justify a conclusion that these leases were *abandoned*. We might state here that we have drawn upon offerings for some of the facts. Also, we may have considered some evidence that was stricken, but plaintiffs agree that such may be done in an equity case. [See Graham v. Karr, 331 Mo. 1157, 55 S. W. (2d) 995, l. c. 1000, 1001; Webb v. Salisbury, 327 Mo. 1123, 39 S. W. (2d) 1045, l. c. 1051, and cases there cited.]

The judgment should be reversed and the cause remanded with directions to dismiss plaintiff's petitions, and it is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur, except, *Douglas, J.,* not voting because not a member of the court when cause was submitted.